**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RITTENHOUSE ENTERTAINMENT, INC.; THE MINES, INC.; G NET COMM. CO.; PHOENIX ESTATES; and THOMAS J. GRECO; | CIVIL ACTION NO. 3:11-617 |
| Plaintiffs, | (JUDGE CAPUTO) |
| v. | |
| CITY OF WILKES-BARRE; THOMAS LEIGHTON, *individually and as Mayor of Wilkes-Barre*; GERALD DESSOYE, *individually and as Chief of Police of Wilkes-Barre*; J.J. MURPHY, *individually and as City Administrator of Wilkes-Barre*; TONY THOMAS, JR., KATHY KANE, WILLIAM BARRET, RICK CRONAUER, and MICHAEL MERRITT, *individually and as Members of the Wilkes-Barre City Council*; BUTCH FRATI, *individually and as Director of Operations of Wilkes-Barre*; LUZERNE COUNTY; MICHAEL SAVOKINAS, *individually and as Luzerne County Sheriff*; KING'S COLLEGE; and FATHER THOMAS J. O'HARA, ROBERT MCGONIGLE, PAUL LINDENMUTH, and JOHN MCANDREW, *individually and as Officers and Employees of King's College*; | |
| Defendants. | |

## MEMORANDUM

Presently before the Court are motions to dismiss Plaintiffs' Amended Complaint

(Doc. 36) filed by three sets of Defendants: the "City Defendants" (the City of Wilkes-Barre,

Thomas Leighton, Gerald Dessoye, J.J. Murphy, Tony Thomas Jr., Kathy Kane, William

Barrett, Rick Cronauer, Michael Merritt, and Butch Frati) (Doc. 40); the "College Defendants"

(King's College, Father Thomas O'Hara, Robert McGonigle, Paul Lindenmuth, and John

McAndrew) (Doc. 41); and the "County Defendants" (Luzerne County and Michael Savokinas). (Doc. 39.)  For the reasons that follow, the motions will be granted in part and denied in part.

## I. Factual Background

The facts as alleged in Plaintiffs' original pleading and contained in the Amended Complaint are as follows:

## A. The Mines Nightclub

Plaintiff Thomas Greco is an officer, director, and principal of two of the Plaintiff Corporations: The Mines, Inc. and Rittenhouse Entertainment, Inc. (collectively, the "Entertainment Corporations"). Mr. Greco and the Entertainment Corporations own and operate a nightclub and bar called The Mines, located across the street from Defendant King's College in Wilkes-Barre, Pennsylvania. Mr. Greco owns the real property where The Mines is located. Mr. Greco and the Entertainment Corporations invested over $900,000 in the development of The Mines.

In early 2009, The Mines was open from Thursday through Saturday evenings from 5:00 p.m. until 2:00 a.m. The nightclub's patrons were 30-40% black and Latino, including minority students from King's College. The Mines enforced a strict dress code and identification policy, and it used metal detectors and an identification scanner with digital back-up. It had an extremely limited number of disturbances–fewer than typical for a nightclub.

## B. Concern from the City of Wilkes-Barre and King's College

At the beginning of January, 2009, Defendants the City of Wilkes-Barre, its Mayor Thomas Leighton, its Chief of Police Gerald Dessoye, and its City Administrator J.J. Murphy

all faced increasing public criticism and scrutiny. There had been an upsurge in violent crimes, and the public was concerned that these Defendants were failing to provide adequate law enforcement.

Mr. Murphy and Chief Dessoye suggested that Mr. Greco speak with Chief Dessoye about The Mines. During that conversation, Chief Dessoye stated that The Mines was not a "good mix" with King's College and that it attracted "the wrong crowd." Mr. Greco advised the Chief that recent criminal incidents near the college did not involve nightclub customers, were near other bars in the area, or occurred on nights when the nightclub was closed.

Defendant Robert McGonigle, the Associate Vice President for Student Affairs at King's College, with the assistance of Defendant John McAndrew, the college's Dean of Students, sent an e-mail to the students at King's College on about April 5, 2009. The e-mail alleged that there were problems with the Mines and invited students to a forum to discuss how to file complaints with the Pennsylvania Liquor Control Board ("PLCB") against the nightclub. On about April 8, 2009, Mr. Greco met with Defendant Father Thomas J. O'Hara, who is President of King's College, and other King's College staff. Father O'Hara advised Mr. Greco that he was under pressure from parents of students at King's College who were threatening to remove their students from the College unless there was action taken against the Mines or it was shut down. Father O'Hara also said that the clientele at The Mines was not a "good mix" with the College and that the nightclub attracted "the wrong crowd." Defendant Paul Lindenmuth, the Chair of the Department of Criminal Justice and Sociology at King's College, falsely told students and staff that there had been drug busts at The Mines and that the nightclub had lost its licenses.

**C. The Campaign of Harassment**

Starting on about April 16, 2009, the City of Wilkes-Barre and Luzerne County began a campaign of harassment against the black and Latino patrons of The Mines. The College Defendants acted in concert with the City and County in order to shut down The Mines and cause damage to Mr. Greco and the Entertainment Corporations.  The City began the harassment by creating and embellishing police reports to make it appear as if criminal incidents were occurring on Mr. Greco's nightclub property. After the harassment began, Father O'Hara told Mr. Greco that King's College would try to shut down The Mines because it had "the wrong crowd." Father O'Hara then met with Mayor Leighton and Chief Dessoye to discuss The Mines.

The following weekend, on about April 23, 2009, six police cruisers and fifteen policemen (including a K-9 drug dog) stationed themselves at the nightclub property for hours. The officers stood in the driveways of the nightclub's parking lots and down the block from the nightclub, harassing and arresting people who attempted to enter The Mines. They conducted breathalizer blood alcohol tests of patrons leaving The Mines and had the drug dog approach people coming or going from the nightclub.  In one instance, the police beat up a patron. The police told the nightclub's manager, "We are closing your boss's place down."

The harassment escalated a week later around April 30, 2009. There were thirty law enforcement officers outside The Mines. This included Defendant Luzerne County Sheriff Michael Savokinas, eight Sheriff's deputies from Defendant Luzerne County, four vehicles, three Pennsylvania State Liquor Control Enforcement agents, a Wilkes-Barre SWAT team, eight Wilkes-Barre police vehicles, a motorcycle police officer, and two K-9 dogs. The

officers did not arrest anyone or issue any citations. The law enforcement presence was merely for the purposes of targeting and harassing Mr. Greco, the Entertainment Corporations, and prospective patrons of The Mines. Then on about May 15 and 16, 2009, Wilkes-Barre police set up seatbelt check points in front of The Mines for two nights.

Prior to this police harassment, the Mines had never received a citation from the PLCB or had any legal or law enforcement action against it.  Other bars in the area whose patrons were 95-99% white had numerous incidents of crime, violence, noise, PLCB citations, and liquor license removals. The City and its police did not undertake similar law enforcement actions against the bars with predominantly white clientele.

All this police activity was pursuant to a custom or policy of the City and the County to discourage businesses in Wilkes-Barre and Luzerne County from serving black and Latino patrons, to use those businesses as scapegoats for the City's and County's law enforcement failures, and to prevent black and Latino people from living in or spending time in the City and the County. The City has previously taken action to close down several other bars and restaurants that served black and Latino clientele.

Because of the police crackdown, there was a decline in business at the Mines. Currently, the nightclub opens approximately once every ten days in order to maintain its liquor license. Mr. Greco and the Entertainment Corporations have lost significant income and income prospects. Mr. Greco has also suffered damage to his reputation.

**D. Felony Charges Against Mr. Greco**

Mayor Leighton and Chief Dessoye induced FBI Agent Joseph Noone to manipulate Mr. Greco into becoming vulnerable to the charge of misprision. Mayor Leighton and Chief Dessoye were friends of Agent Noone and like him, were alumni of King's College. They

acted in retaliation against Mr. Greco for threatening a civil rights lawsuit against the City based on the police harassment at The Mines. As a result of Agent Noone's efforts, Mr. Greco pled guilty to misprision on about November 10, 2010. He was sentenced to two years probation and fifty hours of community service and was fined $10,000.

**E. Denial of Tax Benefits**

Mr. Greco is also a principal of the two other Plaintiff corporations: G Net Comm. Co. and Phoenix Estates (the "Development Corporations"). G Net and Phoenix own real estate in the City of Wilkes-Barre. The City and Mayor Leighton had been considering providing tax and other benefits to the Development Corporations as part of the Keystone Opportunity Zone ("KOZ") program.

Mr. Greco, G Net, and Phoenix invested over $2,900,000 to develop the companies' properties as an advanced broadband economic development project and community green energy geothermal district heating and cooling authority. They had worked on a Pennsylvania bill creating funding grants for geothermal projects using abandoned mine water as a source for green energy. Local Representative Eddie Day Pashinski and Governor Rendell both supported Mr. Greco and the Development Corporations. Because G Net and Phoenix were prime candidates for funding under the bill, Mr. Greco and the Development Corporations urged the City to apply for the grant.

In November and December of 2009, Mayor Leighton, Chief Dessoye and Defendant Butch Frati, who is the City's Director of Operations, convinced Representative Pashinski that he should not support the geothermal project or return phone calls to Mr. Greco, G Net, and Phoenix. This occurred after those Defendants had learned that Mr. Greco was facing charges for a felony. Further, Mayor Leighton, Chief Dessoye, and members of the Wilkes-

Barre City Council (Defendants Tony Thomas, Jr., Kathy Kane, William Barrett, Rick Cronauer, and Michael Merritt) obstructed the granting of KOZ tax benefits to G Net and Phoenix. Specifically, these Defendants failed to grant a site development work extension to the Development Corporations' property, even though the property qualified for an extension and the Defendants granted it to other properties. These Defendants took this action in retaliation for Mr. Greco's involvement with The Mines and his complaints about civil rights violations. Because of the loss of the tax benefits, Mr. Greco and the Development Corporations have incurred financial damage.

**F.     The Amended Complaint**

In addition to those allegations as set forth above, the Amended Complaint includes the following averments:

The College Defendants' efforts to shut down The Mines began in March 2009, prior to the e-mail being sent to the student body. Prior to the distribution of that e-mail, the individual College Defendants met with the City's administrators to develop a plan to close the bar. The plan to shut down The Mines included, but was not limited to, King's College complaining to the Pennsylvania Liquor Control Enforcement ("PLCE") and the City of Wilkes-Barre contacting the PLCE to file a complaint and supply an extraordinarily high number of incident reports (for which the PLCE ultimately determined The Mines operations had no responsibility). Subsequently, Mr. Murphy planned and caused to be filed a spurious complaint with the PLCE against The Mines. The City and College also planned to assemble the students of King's College to further facilitate their plan by advising the students to file complaints about noise and other incidents in an effort to create a record which would cause the closure of The Mines.

7

Subsequent to this meeting of City and College officials, an e-mail was distributed to the students at King's College concerning actions being taken to shut down The Mines. The e-mail was authored and sent on behalf of a number of King's College officials, including Father O'Hara and Mr. McGonigle.

Thereafter, Mr. Greco met with Father O'Hara and the College's senior staff at Father O'Hara's office to discuss the e-mail.  At the meeting, Mr. Greco requested permission to attend the planned forum, but his offer was refused.  And, despite promising at the meeting to do so, King's College refused to cooperate with Mr. Greco and The Mines in addressing the College's concerns about The Mines.

At the forum at King's College, which was also attended by Mr. Murphy and Chief Dessoye, the City and College furthered their plan to close The Mines by encouraging students to create incident reports concerning activities at The Mines.  Father O'Hara subsequently called Mr. Greco and informed him that the College was under pressure from alumni and parents who threatened to remove their children from the College.  As such, Father O'Hara advised Mr. Greco that he would act to close The Mines down.

Father O'Hara and other King's College officials then met and coordinated with City of Wilkes-Barre officials, including Chief Dessoye, Mayor Leighton, and Mr. Murphy, concerning the action to be taken against The Mines in April and May of 2009.  The College's Head of Security then arranged for their security guards to work with the City of Wilkes-Barre to implement the actions taken outside of The Mines, including staging from the College's property.

On April 23, 2009, when the police began camping out on or around The Mines property, the actions were coordinated by Luzerne County, Sheriff Savokinas, Mr. Murphy,

and other City of Wilkes-Barre officials.  In addition, during the week of April 24, 2009, Mr. Frati assigned the City's building inspector to cause an unwarranted inspection of The Mines.  Then, on or about April 25 and 26, 2009, College and City officials coordinated a plan with the PLCE to find a violation against The Mines.  And, on April 30, 2009, Sheriff Savokinas was contacted by City of Wilkes-Barre officals to join City law enforcement personnel in patrolling The Mines.  As a result of that request, a group of eight Luzerne County sheriffs joined City employees and agents patrolling The Mines.

And, in June of 2009, Luzerne County Commissioner Chairman Petrilla and Commissioner Skrepnak agreed to support the KOZ approval for Mr. Greco, G Net, and Phoenix Estates.  However, KOZ approval was ultimately denied because Mayor Leighton, Mr. Murphy, and other City administrators contacted Luzerne County prior to the Commissioners' meeting to conspire to deny the approval.

During Plaintiffs' efforts to obtain funding for the geothermal projects, Plaintiffs requested Mr. Frati and the City of Wilkes-Barre to submit a "letter of intent" so they could apply for Department of Energy grant funds.  Mr. Frati, as the City's Director of Operations, was copied on emails pertaining to this project, met with Mr. Greco, attended City Council meetings, and was directly involved in the decision-making process for grants and KOZ approvals.  Mr. Murphy also attended City Council meetings and worked with Council members to block G Net and Phoenix Estates' participation in the KOZ project.  Ultimately, Mr. Murphy, Mr. Frati, Mayor Leighton, and the City acted together to deny Plaintiffs the opportunity to obtain those funds and approvals.

The following June, Luzerne County breached its lease obligations to Phoenix Estates and refused to continue to meet its rental obligations.  And, in September of 2011,

Luzerne County refused to entertain a bid in response to a Request for Proposal for Luzerne County to lease office space even though Mr. Greco and Phoenix Estates were the only responsive bidders.  And, as a result of these events, Rittenhouse, Mr. Greco, and The Mines have lost an investment of over $900,000.00.

## II. Procedural History

The Plaintiffs filed the instant action on April 4, 2011.  After the City, College, and County Defendants each filed separate motions to dismiss, the Court, on March 19, 2012, granted the motions in part and denied the motions in part.  As to the City Defendants, the Court dismissed the following: (1) the §§ 1983 and 1985 claims against all City Defendants asserted by Mr. Greco and Rittenhouse in Count I; (2) the §§ 1981 and 1982 claims against the City Council Members in Count II; (3) the § 1983 claims against all City Defendants in Count II; (4) Rittenhouse's § 1985 claims against all City Defendants in Count II; (5) the Fifth Amendment claim against all City Defendants in Count III; (6) the Fifth Amendment and Equal Protection claims against all City Defendants in Count IV; (7) the defamation and trade disparagement claims against all City Defendants in Count V; (8) the tortious interference with business relationships claim against the City of Wilkes-Barre in Count V; (9) the claim for attorneys' fees against all City Defendants in Count VIII; and (10) all claims against Mr. Murphy and Mr. Frati. (Docs. 31; 32.)

As to the College Defendants, the claims in Counts I, II, III, VI, and VIII were dismissed. (*Id.*)  And, as to the County Defendants, the following claims were dismissed: (1) the § 1983 claims asserted by Mr. Greco and Rittenhouse in Count I; (2) the § 1985 claims in Count I; (3) the claims asserted in Count II; (4) the Fifth Amendment claims asserted in Count III; (5) the claims asserted in Count V; and (6) the claims asserted in Count VIII. (*Id.*)

Plaintiffs, however, were granted leave to amend as follows:

The Plaintiffs may amend their complaint regarding the following allegations: the allegations regarding the personal involvement of Mr. Murphy and Mr. Frati; the allegations regarding the County and College Defendants' involvement in the alleged conspiracy; the allegations regarding Count I's §§ 1983 and 1985 claims by Mr. Greco and Rittenhouse; allegations regarding Rittenhouse's §§ 1985 claims in Count II; and allegations regarding Count II's §§ 1981 and 1982 claims against the City Council members.

(Doc. 32)

Plaintiffs filed an Amended Complaint on April 6, 2012. (Doc. 36.)[1] The City, College, and County Defendants all filed motions to dismiss on April 20, 2012. (Docs. 39; 40; 41.)[2] Now, as the motions have all been fully briefed, they are ripe for disposition.

### III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000).  The Court does not

---

[1]    Count VI of the Amended Complaint was Count VII of the prior complaint.

[2]    The City Defendants raise arguments in their brief in support of their motion that were not raised in their prior motion to dismiss.  The City Defendants argue that "because an amended complaint supercedes the original complaint, a defendant is permitted to raise substantive arguments in a new responsive pleading irrespective of whether those contentions were raised in response to the original complaint." (Doc. 58, 2.)  Under the Federal Rules of Civil Procedure, however, "a party that makes a motion under [Rule 12] must not make another motion under this rule *raising* a defense or *objection that was available to the party but omitted from its earlier motion*." Fed. R. Civ. P. 12(g)(2) (emphasis added); *see also Garrett v. Cassity*, No. 09-01252, 2011 WL 3035633, at *3 (E.D. Mo. July 28, 2011) ("to the extent Defendants raise arguments in this Motion that could have been raised in their initial motion to dismiss and for a more definite statement, those arguments have been waived and may not be considered").  Accordingly, the Court will not address the arguments that were previously available to the City Defendants but were not raised.

consider whether a plaintiff will ultimately prevail. *See id*.  A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000).

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of what the ... claim is and the grounds upon which it rests. *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Detailed factual allegations are not required. *Twombly*, 550 U.S. at 555.  However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. *Id*.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

As such, the inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element.

*Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1949.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id*. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)).

## IV. Discussion

### A. Defendants Murphy and Frati

As an initial matter, the City Defendants move to dismiss all claims against Mr. Murphy and Mr. Frati. Defendants argue that the Amended Complaint lacks any allegations that these two individuals had any personal involvement in Plaintiffs' claims.

The motion to dismiss Mr. Murphy and Mr. Frati for lack of personal involvement will be denied. As to Mr. Murphy, unlike the original complaint where the sole allegation was that he suggested that Mr. Greco speak with Chief Dessoye about The Mines, the Amended

Complaint asserts that he filed a spurious complaint with the PLCE against The Mines, that he took action to deny the approval of KOZ funds, and that he met and coordinated the actions taken against The Mines in April and May of 2009.  Based on these allegations, Plaintiffs have sufficiently alleged Mr. Murphy's personal involvement in the actions taken against Plaintiffs.  Moving to Mr. Frati, while the complaint initially stated that he only helped convince Representative Pashinski to ignore Mr. Greco's calls and reject the geothermal project, the Amended Complaint asserts that Mr. Frati participated in the campaign of harassment against The Mines, including assigning the building inspector to cause an unwarranted inspection of the facility. As this allegation connects Mr. Frati to the City's campaign of harassment against The Mines, Mr. Frati will not be dismissed from the action for lack of personal involvement.

## B. Count I

The Defendants move to dismiss Count I of the Amended Complaint.  Count I claims, pursuant to 42 U.S.C. §§ 1983 and 1985, that all Defendants "act[ed] in concert to subject plaintiffs and their businesses to far harsher law enforcement action than other businesses similarly situated (other than in the race of their clientele) in violation of said plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the United States." (*Am. Compl.*, ¶ 104.)

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (quoting *Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003))).

### 1. Section 1983

Section 1983 states, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or any other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000); *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).

### a. City Defendants

The City Defendants seek dismissal of the § 1983 claims asserted by Mr. Greco and Rittenhouse in Count I of the Amended Complaint.[3]  In particular, Defendants argue that the Amended Complaint does not establish that Mr. Greco or Rittenhouse suffered any violation of their rights under the Equal Protection Clause of the Fourteenth Amendment.

In previously dismissing Mr. Greco and Rittenhouse's claims in Count I, it was noted that Plaintiffs failed to "allege that Mr. Greco or Rittenhouse were treated differently than similarly situated corporate officers or leaseholders," and the complaint failed to "allege any action specifically directed at Mr. Greco or Rittenhouse." (Doc. 31, 12-13.)  Thus, based on the longstanding principle that "one cannot sue for the deprivation of another's civil rights,"

---

[3]     The Mines' § 1983 claim against the City Defendants in Count I was not previously dismissed.  (Doc. 31, 12; Doc. 32, ¶ (1).)

*O'Malley v. Brierley*, 477 F.2d 785, 789 (3d Cir. 1973), the claims by Mr. Greco and Rittenhouse in Count I were dismissed.

Plaintiffs' Amended Complaint fails to cure these deficiencies. While Plaintiffs assert that "other investors and landlords who operated bars and restaurants whose customers were predominantly white, did not find their enterprises singled out for harassment because of the race of their clientele such as that set forth herein," (*Am. Compl.*, ¶ 106), Plaintiffs only cite one additional allegation in support of their claim that Mr. Greco and Rittenhouse have suffered constitutional deprivations. Specifically, Plaintiffs allege that "Defendant Frati was involved in planning the campaign of harassment against plaintiffs The Mines, Thom Greco, and Rittenhouse Entertainment, Inc., including, but not limited to, assigning the City's cuilding inspector to cause an unwarranted inspection of The Mines the week of April 24, 2009." (*Id.* at ¶ 93.) Again, this allegation fails to allege any action specifically directed at Mr. Greco or Rittenhouse as opposed to The Mines. And, because Mr. Greco and Rittenhouse may not recover for the alleged deprivation of The Mines' constitutional rights, their § 1983 claim against the City Defendants in Count I will be dismissed.

### b. County Defendants

The County Defendants seek dismissal of Mr. Greco and Rittenhouse's equal protection claim in Count I.[4] Specifically, the County Defendants argue that Plaintiffs fail to sufficiently allege concerted activity to demonstrate that the County participated in actions with City officials.

For the reasons set forth in the March 19, 2012 Memorandum, Mr. Greco and Rittenhouse's § 1983 equal protection claim in Count I will be dismissed. Outside of the conclusion that Mr. Greco and Rittenhouse were treated differently than other landlords and

---

[4] The Mines'§ 1983 claim in Count I against the County Defendants was also not dismissed. (Doc. 31, 12; Doc. 32, ¶ 3(a).)

investors who operated bars and restaurants with predominantly white customers, the Amended Complaint contains no factual averments that the County Defendants treated Mr. Greco or Rittenhouse (separate and apart from The Mines) differently than other similarly situated individuals or entities.  That is, the factual averments in the Amended Complaint against the County Defendants implicate conduct directed towards closing The Mines and not towards Mr. Greco as the owner/investor or Rittenhouse as the landlord.  And, as Mr. Greco and Rittenhouse may not assert claims for the violation of the civil rights of another, the § 1983 claim against the County Defendants in Count I will be dismissed.

### c. College Defendants

The College Defendants also seeks dismissal of the § 1983 claims in Count I.[5]  The College Defendants argue that they did not act under color of state law.  Alternatively, the College Defendants assert that only The Mines, and not Mr. Greco or Rittenhouse, have standing to pursue the equal protection claim in the Count I.

Generally, "[a]ction under color of state law 'requires that one liable under § 1983 have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (quoting *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998)).  The College Defendants are private parties, and thus were not clothed with the authority of state law.  But private citizens who conspire with a state actor are also acting under color of law for the purposes of § 1983. *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).  The College Defendants argue that "Plaintiffs fail to set forth facts to show any concerted action between the King's College Defendants and any of the state actors to carry out the

---

[5]     The § 1983 claim in Count I against the College Defendants was dismissed as to all Plaintiffs because they failed to plead a conspiracy that would transform the private Defendants into state actors. (Doc. 31, 13.)

alleged custom and policy of the City."

In order to state a claim for a conspiracy, a plaintiff must present "'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556)). Further, the plaintiff "must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Id.* at 179 (quoting *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1166 (3d Cir. 1989), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000)).

Plaintiffs' claims against the College Defendants were previously dismissed because Plaintiffs only alleged a single meeting between Father O'Hara, Mayor Leighton, and Chief Dessoye, and the original complaint failed to allege any actions in furtherance of the conspiracy on the part of the College Defendants. (Doc. 31, 14.)

Now, however, The Mines has "properly plead an unconstitutional conspiracy . . . from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral*, 615 F.3d at 178.   The Mines alleges: (1) King's College and the individual King's College Defendants met with City administrators in March of 2009 to plan how to close The Mines; (2) the plan included King's College and the City contacting the PLCE to file complaints; (3) the City and King's College advised students to file noise and other complaints about The Mines; (4) after the meeting with City administrators, an e-mail was sent to the College's students concerning the efforts to shut down The Mines; (5) City and College officials attended the forum at the College encouraging students to create incident reports concerning The Mines' activities; (6) King's College officials met with Mayor Leighton, Chief Dessoye, and Mr. Murphy to coordinate the actions taken against The Mines in April and

May of 2009; (7) the actions taken outside of The Mines were staged from the College's property; and (8) King's College and Wilkes-Barre City officials coordinated a plan with the PLCE on April 25 and 26, 2009 to find a violation at The Mines. (*Am. Compl.*, ¶¶ 64-67, 70-74.)  As these allegations adequately detail the period of the conspiracy- March through May of 2009-, the object of the conspiracy- to close The Mines due to the race of its clientele-, and the actions of the conspirators, The Mines has adequately alleged that the College Defendants acted under the color of state law.[6]

As to Mr. Greco and Rittenhouse, however, the allegations in the Amended Complaint do not involve any allegations of action specifically directed at these Plaintiffs and, instead, all implicate the conspiracy to close The Mines.  Because Mr. Greco and Rittenhouse cannot bring this action for the deprivation of another's civil rights, the § 1983 claim in Count I of the Amended Complaint asserted by Mr. Greco and Rittenhouse against the College Defendants will be dismissed.

### 2. Section 1985

42 U.S.C. § 1985 has three subsections: § 1985(1) deals with preventing an officer from performing duties; § 1985(2) addresses obstruction of justice or intimidating a party, witness, or juror; and § 1985(3) focuses on the deprivation of rights or privileges. As with

---

[6]     The College Defendants argue that "an individual does not act under color of law merely by reporting an alleged crime to police officers who take action thereon." (Doc. 45, 10-11.)  The allegations in Plaintiffs' Amended Complaint, however, are not simply that the College Defendants furnished information to City law enforcement personnel.  Rather, the Amended Complaint includes allegations that the College Defendants coordinated the campaign of harassment against The Mines and participated directly in this campaign.  As such, these allegations of concerted activity with City officials are much greater than in the authority relied upon by the College Defendants. *See, e.g., Cvetko v. Derry Twp. Police Dep't*, No. 09-1260, 2010 WL 1791140, at *4 (M.D. Pa. May 4, 2010) (sole action of alerting police department of the plaintiff's activities does not demonstrate that private actor was proceeding under color of state law).

Plaintiffs' original complaint, the Amended Complaint does not identify a particular subsection of § 1985, but I will assume based on the facts that its claim falls under § 1985(3).  42 U.S.C. § 1985(3) provides, in pertinent part:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . .  in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

> To state a claim under § 1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971).

### a. City Defendants

The City Defendants seek dismissal of the § 1985 claim in Count I asserted by Rittenhouse and Mr. Greco.[7]  The claim will be dismissed based on the same reasoning applied in the analysis of the § 1983 claim: Mr. Greco and Rittenhouse cannot assert a civil rights claim based on the alleged deprivation of The Mines' equal protection rights.

### b. County Defendants

The County Defendants seek dismissal of the § 1985 equal protection claim in Count

---

[7]     The Mines' § 1985 claim in Count I was not previously dismissed as to the City Defendants. (Doc. 32, ¶ 1(b).)

I and assert that the concerted actions allegations are insufficient to state a conspiracy claim. Specifically, the County Defendants argue that nothing in the allegations in the Amended Complaint are "unusually suggestive of discriminatory animus, an improper motive, or an acceptance of a conspiratorial purpose." Instead, the allegations against the County Defendants rely upon the conduct of Sheriff Savokinas cooperating with local law enforcement and providing assistance upon request. As such, the County Defendants assert that there is no "factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184 (3d Cir. 2009).

Here, the existence of a conspiracy between the County Defendants and the other Defendants cannot "be inferred from the circumstances." *Id*. In particular, the only allegations which implicate the County Defendants in the alleged conspiracy to close The Mines are:

> 53. On or about April 30, 2009, the targeting and harassing escalated even further, with about (30) enforcement officers camping outside The Mines, including, besides City personnel, eight (8) Luzerne County Sheriffs' deputies with four (4) vehicles including defendant Savokinas . . .
>
> . . .
>
> 76. Defendant Luzerne County and defendant Sheriff Savokinas worked with defendant Murphy and other City officials to coordinate the actions taken against The Mines on the weekend of April 23-25, 2009.
>
> 77. On April 30, 2009, defendant Savokinas responded to a request from defendants associated with the defendant City in furtherance of a plan to send an unprecedented and extraordinarily large detachment of eight (8) deputy sheriffs, lead by defendant Savokinas, to join employees and agents of defendant City in harassing The Mines and its customers and employees as described in paragraph 53 above.

(*Am. Compl*.)

While these allegations all support The Mines' § 1983 claim in Count I- that the

County Defendants treated The Mines differently than similarly situated nightclubs- the allegations fail to set forth that an "agreement was made" between the County and City Defendants to harass The Mines. *G. Western Mining & Mfg.*, 615 F.3d at 178.  Likewise, Plaintiffs have "not pled any facts that plausibly suggest a meeting of the minds" between the County Defendants and the City Defendants. *Id*. at 179.  Instead, Plaintiffs allegations are merely that the County, through Defendant Savokinas, worked with City officials to take action against The Mines on one weekend by responding to an unprecedented request to send a large detachment of sheriffs to The Mines on this occasion.  These allegations are unlike those directed towards the College Defendants where its officials are alleged to have organized, met, and planned with the City Defendants to take unlawful action against Plaintiffs from March through May of 2009.  As a result, the allegations of a conspiracy against the County Defendants are too tenuous to demonstrate a conspiratorial link between the County and City Defendants, which involved the parties working together on only one occasion.  As such, it cannot be inferred that the County Defendants reached an agreement with the City Defendants (or the College Defendants for that matter) to engage in a campaign of harassment against The Mines or to partake in a conspiracy to violate The Mines' constitutional rights.  Accordingly, The Mines § 1985 claim in Count I against the County Defendants will be dismissed.

And, as there are no allegations that the County Defendants reached a conspiracy directed at Mr. Greco and Rittenhouse, their § 1985 claim against the County Defendants in Count I will also be dismissed.

### c. College Defendants

The Mines will be permitted to proceed on its § 1985 claim against the College Defendants. As set forth in the analysis of the §1983 claim, The Mines has sufficiently pled

the existence of a conspiracy between the City and College Defendants to deprive it of its equal protection rights based on discriminatory animus.  Moreover, The Mines has alleged multiple overt acts in furtherance of the conspiracy, for example encouraging students to file complaints against The Mines and the College's Head of Security coordinating the harassment of The Mines with City officials.  Accordingly, the College Defendants' motion to dismiss The Mines § 1985 claim in Count I will be denied.

However, the § 1985 claims of Mr. Greco and Rittenhouse against the College Defendants in Count I will be dismissed.  The reasoning applied in my analysis of the § 1983 claim also applies: Mr. Greco and Rittenhouse cannot assert a civil rights claim based on the alleged deprivation of The Mines' equal protection rights.

## C. Count II

In Count II of the Amended Complaint, Mr. Greco and the Entertainment Corporations bring claims pursuant to 42 U.S.C. §§ 1981, 1982, and 1985, alleging that Defendants acted "in retaliation against plaintiffs for welcoming Black and Latino persons as patrons at their establishment and . . . as part of a custom and policy designed to drive such persons out of Wilkes-Barre and the neighboring communities." (*Am. Compl.*, ¶ 109.)

### 1. Sections 1981 and 1982

42 U.S.C. §§ 1981 and 1982 were passed as part of the "immediately post-Civil War legislative effort to guarantee the then newly freed slaves the same legal rights that other citizens enjoy." *CBOCS v. Humphries*, 553 U.S. 442, 448 (2008).  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  Section 1982 provides, among other things, that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and

personal property." Both statutes are construed similarly based on their "common language, origin, and purposes." *Humphries*, 553 U.S. at 448.   As I previously noted in the March 19, 2012 Memorandum, both statutes are applicable to the instant case. (Doc. 31, 16.)

Plaintiffs' claim in Count II is for retaliation pursuant to §§ 1981 and 1982.   The Supreme Court determined in *Humphries* that both §§ 1981 and 1982 encompass "the claim of an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 [or § 1982] rights.'" 553 U.S. 442, 445 (2008).   As I previously noted, "[t]o establish retaliation [under § 1981], plaintiffs must show that the plaintiffs were (1) engaged in an activity protected under the anti-discrimination statutes, (2) the defendants were aware of plaintiff's participation in the protected activity, (3) the defendants took adverse action against plaintiffs based upon their activity, and (4) a causal connection existed between the plaintiffs' protected activity and the adverse action taken by defendants." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001). And, "the elements of a *prima facie* case are the same under either § 1981 or § 1982." *Caddy v. J.P. Morgan Chase Bank*, 237 F. App'x 343, 346 (7th Cir. 2007) (citing *Houston v. Benttree, Ltd.*, 637 F.2d 739, 741 (10th Cir. 1980)).

### a. City Defendants

The City Council Defendants seek dismissal of Plaintiffs' §§ 1981 and 1982 claims asserted in Count II of the Amended Complaint.[8]   As set forth in the March 19, 2012 Memorandum, the claim was dismissed without prejudice as to these Defendants because the complaint failed to allege that the City Council knew that Plaintiffs had spoken out against the alleged discriminatory actions.  Because Plaintiffs' Amended Complaint fails to

---

[8]      In the March 19, 2012 Memorandum, it was determined that The Mines and Mr. Greco adequately stated a retaliation claim under §§ 1981 and 1982 against Mayor Leighton, Chief Dessoye, and the City of Wilkes-Barre. (Doc. 31, 17.)

cure this deficiency, the §§ 1981 and 1982 retaliation claim against the City Council members, as well as Defendants Murphy and Frati, in Count II of the Amended Complaint will be dismissed.  Likewise, Rittenhouse, has failed to state a § 1981 or § 1982 retaliation claim because the Amended Complaint does not allege any protected activity on the part of Rittenhouse, as investing in a corporation that serves minorities is not a protected interest under either statute. Rittenhouse's claims will thus be dismissed.

### b. County Defendants

Plaintiffs have also failed to state a § 1981 or § 1982 retaliation claim against the County Defendants.[9] The complaint does not allege that Plaintiffs complained to or threatened to sue any of these Defendants, nor does it allege that these Defendants knew that the Plaintiffs had spoken out against the alleged discriminatory actions. Without knowledge of protected activity and then adverse action in response, there is no retaliation claim under these statutes. Therefore, the claim against these Defendants will be dismissed.

### c. College Defendants

As to the College Defendants, Mr. Greco and Rittenhouse have failed to state a § 1981 or § 1982 retaliation claim in Count II of the Amended Complaint.  The Amended Complaint does not allege any protected activity on the part of Rittenhouse, nor does the Amended Complaint allege that Mr. Greco threatened to sue the College Defendants for allegedly interfering with black and Latino individuals' right to purchase goods and services from The Mines.  However, The Mines has adequately stated §§ 1981 and 1982 claims against the College Defendants because the Amended Complaint alleges that The Mines engaged in the protected activity of entering into contracts and sales of personal property

---

[9]      The §§ 1981 and 1982 claims were previously dismissed as to these Defendants.

25

to minorities. (Doc. 31, 17.)  And, the Amended Complaint also alleges that the College Defendants were aware of the protected activity and conspired with the City Defendants to instigate police harassment in response to the protected activity.  Thus, The Mines has adequately asserted §§ 1981 and 1982 claims in Count II of the Amended Complaint against the College Defendants**.**

### 2. Section 1985

#### a. City Defendants

The City Defendants seek dismissal of the § 1985 claims of Rittenhouse in Count II of the Amended Complaint.[10]  In previously dismissing this claim, it was noted that "no facts demonstrate that Rittenhouse engaged in any protected activity, and it cannot file suit based on the deprivations of Mr. Greco and The Mines." (Doc. 31, 20.)  Having failed to cure these deficiencies in the Amended Complaint, Rittenhouse's § 1985 claim against the City Defendants in Count II will be dismissed.

#### b. County Defendants

Plaintiffs' § 1985 claims in Count II against the County Defendants will be dealt with in a manner similar as those asserted in Count I.  First, Rittenhouse has not alleged any facts demonstrating that it engaged in protected activity, and the claim will therefore be dismissed.  And, as Mr. Greco and The Mines fail to allege facts sufficient to demonstrate a conspiracy on the part of the County Defendants, their § 1985 claims in Count II against the County Defendants will be dismissed.[11]

---

[10]   The Mines and Mr. Greco's § 1985 retaliation claims in Count II against the City Defendants were not previously dismissed. (Doc. 32, ¶ (1)(b).)

[11]   The County Defendants and Plaintiffs dispute whether The Mines and Mr. Greco's § 1985 claims in Count II were dismissed with leave to amend.  Regardless, Plaintiffs' Amended Complaint fails to state such a claim against the County Defendants.

### c. College Defendants

The College Defendants also seek dismissal of Plaintiffs' § 1985 claims in Count II. As previously noted, no facts are alleged that Rittenhouse engaged in any protected activity, and it cannot file suit based on the deprivations of Mr. Greco and The Mines. Accordingly, Rittenhouse's § 1985 claim against the College Defendants in Count II will be dismissed.

As to The Mines and Mr. Greco's § 1985 claims against the College Defendants in Count II, they will be dealt with the same as in Count I. Thus, with respect to The Mines' conspiracy claims against the College Defendants in Count I, the Amended Complaint contains sufficient allegations that the private College Defendants conspired with City officials to deprive The Mines of constitutionally protected rights. Thus, The Mines may proceed with this claim. But because the Amended Complaint does not allege that King's College conspired with City Defendants in retaliation against Mr. Greco, as opposed to The Mines, based on the assertion of his constitutional rights, Mr. Greco's § 1985 claim against the College Defendants in Count II will be dismissed.

## D. Count III

Count III alleges violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, based on the Defendants' alleged abuse of police power to destroy Plaintiffs' business, harassment and stigmatization of Plaintiffs, and deprivation of Plaintiffs' right to use property and pursue an occupation. (*Am. Compl.*, ¶ 111.) The College Defendants seek dismissal of the claim for failure to state a claim upon which relief can be granted.[12]

The Due Process Clause of the Fourteenth Amendment prohibits states from

---

[12] Count III was already determined to adequately state a due process claim against the City and County Defendants. (Docs. 31, 21-23; 32, ¶¶ (1)(c), (3)(c).) Thus, the County Defendant's motion to dismiss this claim will be denied.

depriving "any person of life, liberty, or property without due process of the law."  U.S. Const. amend. XIV.  Due process under the Fourteenth Amendment "has both substantive and procedural components."  *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 658 (3d Cir. 2011).  As previously noted, Count III asserts a substantive due process claim. (Doc. 31, 21.)  The substantive component of the Due Process clause "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Newman v. Beard*, 617 F.3d 775, 782 (3d Cir. 2010) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).  To establish a substantive due process violation, a plaintiff must prove: (1) the deprivation of an interest protected by the substantive due process clause; and (2) that the government's deprivation of that protected interest shocks the conscience. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009) (citing *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)).

In the March 19, 2012 Memorandum, it was determined that Plaintiffs stated the deprivation of a protected right against the City and County Defendants.  Specifically, I noted that ownership and use of real property is an interest protected by substantive due process. (Doc. 31, 22-23 (citing *DeBlasio v. Zoning Bd. of Adjustment for Twp. of West Amwell*, 53 F.3d 592, 601 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003))).  And, because Plaintiffs asserted that they were deprived of a property right by virtue of not being able to realize the benefit of their $900,000 investment in the property owned by Mr. Greco, as the campaign of harassment made it financially impossible for them to operate the nightclub more than sporadically, this allegation sufficiently stated a claim that Plaintiffs were deprived of their right to use and enjoy their property. (*Id.*)  And, Mr. Greco also stated the denial of a liberty interest in pursuing his occupation. (*Id.*)

In addition, Plaintiffs also successfully alleged a deprivation that was shocking to the conscience. (*Id.*)  The standard of what is conscience shocking is subjective and depends on context, but "it is governmental conduct intended to injure that is most likely to rise to the conscience-shocking level." *Evans v. Sec'y of Pa. Dep't of Corr.*, 645 F.3d 650, 660 (3d Cir. 2011) (internal quotations omitted) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)).  "[A]llegations of corruption, self-dealing, [or] bias against an ethnic group" suggest conscience-shocking behavior. *Chainey*, 523 F.3d at 220 (3d Cir. 2008). And, if Plaintiffs' allegations that the City and County purposely targeted The Mines for harassment because of the race of the patrons were true, it would shock the conscience. (Doc. 31. 23.)  Thus, Plaintiffs were determined to have stated a claim for a substantive due process violation against the City and County Defendants.

The due process claim against the College Defendants was previously dismissed because of "insufficient facts linking the College Defendants to a conspiracy involving police harassment."  The College Defendants argue that this claim cannot proceed because Plaintiffs have failed to allege the existence of a conspiracy.  But, as noted above, Plaintiffs' Amended Complaint cured the inadequate allegations by pleading in detail that the College Defendants organized, planned, and met with City officials to develop the campaign of harassment in an attempt to have The Mines closed. (*Am. Compl.*, ¶¶ 64-74.)  And, as these allegations all implicate Plaintiffs' ability to own and use their property, or pursue a chosen occupation, in a manner that, if true, would be conscious shocking, Plaintiffs have adequately stated a due process claim against the College Defendants.  The College Defendants' motion to dismiss Count III of the Amended Complaint will therefore be denied.

## E. Count V

In Count V, Plaintiffs assert a state law tortious interference with business

relationships claim against Mayor Leighton, Chief Dessoye, Mr. Murphy, the City Council members, Mr. Frati, Father O'Hara, Mr. McGonigle, Mr. Lindenmuth, and Mr. McAndrew. (*Am. Compl.*, ¶ 115.)[13]   With the exception of Mr. Murphy and Mr. Frati, the tortious interference with business relationships claim was permitted to proceed as to "the individual City and College Defendants." (Doc. 31, 29.)  Accordingly, the only issue is whether the Amended Complaint adequately states a claim in Count V as to Defendants Murphy and Frati.

To state a claim for the tort of interference with a business relationship, a plaintiff must allege the following: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and, (4) the occasioning of actual damage resulting from the defendants conduct." *Vintage Homes, Inc. v. Levin*, 554 A.2d 989, 994 (Pa. Super. Ct. 1989). Although courts are hesitant to define "prospective contractual relation," a plaintiff must demonstrate "reasonable likelihood or probability [of a contractual relation] . . . something more than a mere hope or innate optimism." *InfoSAGE, Inc. v. Mellon Ventures, L.P.*, 896 A.2d 616, 627 (Pa. Super. Ct. 2006) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 898-99 (Pa. 1971)).

As noted above, the Amended Complaint alleges that Mr. Murphy and Mr. Frati participated with the other City Defendants in coordinating the conspiracy to interfere with the nightclub's business in an attempt to close The Mines.  Additionally, these Defendants are alleged to have played a role in preventing Plaintiffs from obtaining grants and KOZ approvals.  And, as the allegations against Mr. Murphy and Mr. Frati satisfy the second element of showing intent to harm by interfering with a contractual relation, Plaintiffs have

---

[13]     The Amended Complaint also contains claims for trade disparagement and defamation.  These claims, however, have already been dismissed. (Doc. 49.)

stated a tortious interference claim against Defendants Murphy and Frati, and their motion to dismiss Count V will be denied.[14]

**F. Leave to Amend**

Plaintiffs will not be given the opportunity to file a Second Amended Complaint. Under Rule 15 of the Federal Rules of Civil Procedure, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15.  The Third Circuit has stated that leave to amend may be denied due to delay, failure to cure the deficiency by amendments previously allowed, or futility of amendment. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993).  Here, Plaintiffs have already been given the opportunity to amend their pleading once and further amendment would result in undue delay.  Accordingly, leave to amend will be denied.

## V. Conclusion

For the above stated reasons, the Defendants' motions to dismiss will be granted in part and denied in part.  In accordance with this Memorandum and the March 19, 2012 Memorandum and Order, Plaintiffs may proceed on the following claims set forth in the Amended Complaint:

As to the City Defendants: (1) The Mines' §§ 1983 and 1985 claims in Count I; (2) The Mines and Mr. Greco's §§ 1981 and 1982 claims in Count II against Mayor Leighton, Chief Dessoye, and the City of Wilkes-Barre; (3) The Mines' and Mr. Greco's § 1985 claims in Count II; (4) the Fourteenth Amendment claims in Count III; (5) the Fourteenth Amendment Due Process claim against the City of Wilkes-Barre, Mayor Leighton, and the City Council members in Count IV; (6) the tortious interference with business relationships

---

[14]     The City Defendants also move to dismiss Count VI of the Amended Complaint (formerly Count VII).  As the City Defendants' motion to dismiss this claim was already denied, (Doc. 31, 28-29), the motion to dismiss Count VI will be denied.

claim in Count V against the individual City Defendants; and (7) Mr. Greco's claim against Mayor Leighton and Chief Dessoye in Count VI.

As to the County Defendants: (1) The Mines' § 1983 claim in Count I; and (2) the Fourteenth Amendment claims in Count III.

And, as to the College Defendants: (1) The Mines' §§ 1983 and 1985 claims in Count I; (2) The Mines' §§ 1981, 1982, and 1985 claims in Count II; (3) the Fourteenth Amendment claims in Count III; and (4) the tortious interference with business relationships claim in Count V.

An appropriate order follows.


 August 16, 2012                                              /s/ A. Richard Caputo
Date                                                         A. Richard Caputo
                                                             United States District Judge