# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RITTENHOUSE ENTERTAINMENT, INC.;
THE MINES, INC.; G NET COMM. CO.;
PHOENIX ESTATES; and THOMAS J.
GRECO;

CIVIL ACTION NO. 3:11-617

      Plaintiffs,

(JUDGE CAPUTO)

         v.

CITY OF WILKES-BARRE; THOMAS
LEIGHTON, *individually and as Mayor of
Wilkes-Barre*; GERALD DESSOYE,
*individually and as Chief of Police of
Wilkes-Barre*; J.J. MURPHY, *individually
and as City Administrator of Wilkes-Barre*;
TONY THOMAS, JR., KATHY KANE,
WILLIAM BARRET, RICK CRONAUER,
and MICHAEL MERRITT, *individually and
as Members of the Wilkes-Barre City
Council*; BUTCH FRATI, *individually and
as Director of Operations of Wilkes-Barre*;
LUZERNE COUNTY; MICHAEL
SAVOKINAS, *individually and as Luzerne
County Sheriff*; KING'S COLLEGE; and
FATHER THOMAS J. O'HARA, ROBERT
MCGONIGLE, PAUL LINDENMUTH, and
JOHN MCANDREW, *individually and as
Officers and Employees of King's College*;

      Defendants.

## MEMORANDUM

      Presently before the Court are Motions for Summary Judgment filed by three sets

of Defendants: the "City Defendants" (the City of Wilkes-Barre, Thomas Leighton, Gerald

Dessoye, J.J. Murphy, Tony Thomas Jr., Kathy Kane, William Barrett, Rick Cronauer,

Michael Merritt, and Butch Frati) (Doc. 135); the "College Defendants" (King's College,

Father Thomas O'Hara, Robert McGonigle, Paul Lindenmuth, and John McAndrew) (Doc.

138); and the "County Defendants" (Luzerne County and Michael Savokinas). (Doc. 141.) For the reasons that follow, the motions will be granted in part and denied in part.

## I. Factual Background

The following factual background is undisputed, and is construed in the light most favorable to Plaintiffs.

### A. The Parties

#### 1. Plaintiffs

Thomas Greco owns property at 101-105 North Main Street, Wilkes-Barre, Pennsylvania in which The Mines club is located. (Doc. 137 at ¶ 1.)

Rittenhouse Entertainment, Inc. ("Rittenhouse") is a corporation of which Mr. Greco is the president, vice president, treasurer, secretary, and one hundred percent shareholder that leases 101-105 North Main Street from Mr. Greco and owns improvements at The Mines. (Doc. 137 at ¶ 2.)

The Mines, Inc. ("The Mines") is a business owned by Mr. Greco, which subleased 101-105 North Main Street from Rittenhouse and operated a nightclub/bar there. (Doc. 143 at ¶ 3.)

G Net Comm. Co, Inc. ("G Net") is a corporation of which Mr. Greco is the owner, president, and sole officer that owns property located at 135 North Washington Street in Wilkes-Barre. (Doc. 137 at ¶ 4.)

Phoenix Estates is a partnership in which Mr. Greco is the only partner that owns property located at 89 North Washington Street in Wilkes-Barre. (Doc. 137 at ¶ 5.) I will refer to G Net and Phoenix Estates together as the "Development Corporations."

2

### 2. City Defendants

The City of Wilkes-Barre is a municipality in Luzerne County, Pennsylvania. (Doc. 137 at ¶ 6.)

Thomas Leighton was Wilkes-Barre's Mayor from 2004 to 2016. (Doc. 137 at ¶ 7.)

Gerard Dessoye was Chief of the Wilkes-Barre Police Department during the relevant times. (Doc. 137 at ¶ 8.)

J.J. Murphy was the City Administrator of Wilkes-Barre during the relevant times. (Doc. 137 at ¶ 9.)

Tony Thomas, Jr., Kathy Kane, William Barrett, Rick Cronauer, and Michael Merritt were Wilkes-Barre City Council members during the relevant times. (Doc. 137 at ¶¶ 10-14.)

Butch Frati is Wilkes-Barre's Director of Operations. (Doc. 137 at ¶ 15.)

### 3. County Defendants

Luzerne County is a county of the third class. (Doc. 143 at ¶ 16.)

Michael Savokinas was the Sheriff of Luzerne County during the relevant times. (Doc. 144-3 at 12:4-9.)

### 4. College Defendants

King's College ("King's College" or the "College") is a private educational institution with its principal place of business in Wilkes-Barre, Pennsylvania. (Doc. 139 at ¶ 1.)

Father Thomas O'Hara was President of King's College from 1999 until 2011. (Doc. 139 at ¶ 3.) Father O'Hara lived in the residence halls during the relevant time. *Id.* at ¶ 4.

Robert McGonigle was King's College's Associate Vice President for Student Affairs and Dean of Students. (Doc. 139 at ¶ 7.) In 2009, he was responsible for residence life, campus activities, the college diversity office, and was the student conduct officer. *Id.* at ¶

3

8. Mr. McGonigle reported to Vice President for Student Affairs Janet Mercincavage. *Id.* at ¶¶ 20, 22.

Plaintiffs concede that, following discovery, they have not established a claim against Paul Lindenmuth or John McAndrew. They will therefore be dismissed from this action.

**B. The Mines Nightclub**

The Mines was open on Thursdays, Fridays, and Saturdays. (Doc. 137-29 at 97:10-11; 91:20-21.) The Mines opened in September 2008 and closed in June or July of 2009. *Id.* at 138:12-14; 139:8-15.

Mr. Greco testified that on Thursdays, The Mines was open to customers over 18 years old, and would average around 800 customers. *Id.* at 73:11-14. On Fridays, The Mines was open to customers under 21 years old, and would average around 400 customers. *Id.* at 73:19-22. On Saturdays, The Mines was open to customers over 21 years old, and would average around 500-600 customers. *Id.* at 73:23-25. Security Solutions provided security for The Mines. (Doc. 137-14 at 15:1-16:1.)

The Mines had a dress code, which denied entry to potential customers wearing gang colors. (Doc. 137-29 at 84:18-20.) The Mines turned away 50 to 70 people per night for failing to comply with this policy, which is "a lot." *Id.* at 119:2-8. Matthew Basso, who worked in security at The Mines, said turning people away for wearing gang colors happened "especially" at the Mines because of its under-21 nights, and that he "[a]bsolutely" denied entry to members of the Bloods gang. (Doc. 137-22 at 78:1-15; 103:8-14.) Plaintiffs know of no other bars or nightclubs excluding 50-70 persons per night from their premises through screening processes. (Doc. 137-40 at ¶ 19, deemed admitted.) When The Mines denies entry to any patron, "[t]hey're back out on the streets." *Id.* at 72:8-9.

4

Mr. Greco estimates the crowd at The Mines was approximately 30-40% minority. (Doc. 137-29 at 125:21-24.) James Sperrazza, of Security Solutions, who checked all patrons at the door, estimated the racial makeup of the Mines' clientele to be 20-25% African American, 5% Hispanic, and the rest Caucasian. (Doc. 137-14 at 27:2-4.) The Hardware Bar, another bar in Wilkes-Barre, had approximately five percent minority customers during the relevant time. *Id.* at 132:9-18. Gonda's, a bar located "[r]ight next door" to The Mines, had around 30% minority customers when The Mines was open. (Doc. 137-29 at 133:5-14.) Senuna's, a bar located one block away from The Mines, had 1-2% minority clients. *Id.* at 133:17-134:3. There are no official numbers of minority patrons for The Mines or any other bar in the record – Mr. Greco testified he never did an exact count at The Mines and he estimated the percentage of minority customers at other bars in the area by "driv[ing] by" the bars on a regular basis. *Id.* at 128:1-130:12.

Mayor Leighton, Chief Dessoye, Father O'Hara, and Mr. McGonigle had no knowledge of the racial makeup of The Mines' customers. (Doc 137-34 at 279:17-22; Doc. 137-12 at 285:16-286:11; Doc. 137-9 at 218:12-16; Doc. 137-26 at 68:23-25.)

On Thursdays and Fridays at The Mines, approximately 65-70% of patrons were college students. (Doc. 137-14 at 78:18-79:2; 137-22 at 64:6-19.) The Mines saw a "drastic drop" in attendance "starting for the summer." (Doc. 137-16 at 45:16-46:1.) The King's College spring semester ended in the beginning or middle of May. (Doc. 137-9 at 217:6-18.)

## C. Criminal Incidents Near The Mines

Violent crime in Wilkes-Barre increased around March to May 2009. (Doc. 137-31 at 169:12-22.) Mr. Greco acknowledged that the city was "riddled with crime," and "everything is floating around," and The Mines cannot control whether customers denied

5

entry stray onto the nearby King's College campus. (Doc. 137-29 at 211:3-15.) There were stabbings in The Mines' neighborhood, and "huge fights" behind the 105 North Main Street building where The Mines was located, including during the daytime. (Doc. 137-2 at 121:24-122:4.) Some examples of incidents near The Mines in early 2009 include the following.

On January 16, 2009, four individuals were arrested outside The Mines for disorderly conduct, involving fighting and yelling, when a fight involving several individuals erupted in a crowd of 100-150 people. (Doc. 137-6 at 201:13-202:4; Doc. 137-4 at 212:10-19.)

On February 20, 2009, a male individual was arrested for simple assault outside The Mines in an incident in which a female was punched in the face. (Doc. 137-6 at 202:13-23.) The same night, Wilkes-Barre police officers were dispatched to a fight outside The Mines in which one of the people involved was reported to have a gun. (Doc. 137-4 at 215:1-11.) The individual ignored police orders to stop moving and raise his hands, and was tackled to the ground by officers at gunpoint. *Id.* at 215:12-16.

On March 6, 2009, a Wilkes-Barre police officer radioed for additional officers due to "a large number of persons" fighting outside the Mines, to which ten officers responded, including two Pennsylvania state troopers. (Doc. 137-4 at 218:12-19.) Over 100 people were observed in the area of the fight, with more emerging from The Mines. *Id.* at 218:14-23.

On March 13-14, 2009, police responding to a report of a fight found a 25 year-old male Mines patron lying in the middle of North Main Street with a King's College shuttle bus driver providing first aid. *Id.* at 223:5-23.

On March 15, 2009, police responded to an armed robbery at Gonda's, a bar next door to The Mines. (Doc. 137-6 at 214:11-24.)

On March 27, 2009, a fight was reported by King's College security in front of The

Mines, in which about 200 people were fighting in the street. (Doc. 137-4 at 227:23-228:1; Doc. 137-6 at 192:19-193:18, 195:19-23.) Wilkes-Barre police officers called State, Kingston, Plains, and Wilkes-Barre Township police departments for back-up assistance because they became surrounded by the crowd. (Doc. 137-12 at 59:6-15.) Eight Wilkes-Barre police cruisers, two Kingston police cruisers, and one Pennsylvania state police cruiser responded to the fights and apprehended five subjects. (Doc. 137-4 at 228:1-5.) This incident was the first time since the late 1970s or early 1980s that Wilkes-Barre police had been surrounded and outnumbered by a crowd in this way. (Doc. 137-12 at 276:3-279:18.)

On April 17, 2009, an individual was assaulted by several actors in The Mines parking lot. (Doc. 137-4, City Ex. 315.) The victim was bleeding profusely from the mouth and nose, and lying on the ground. *Id.* He was shouting and, as he did, "a substantial amount of blood was spewed onto officers faces, and uniforms." *Id.*

### D. Involvement of King's College

Beginning in fall 2008, King's College experienced a rise in criminal incidents involving students in the neighborhood of the College, which is located near the Mines. (Doc. 139 at ¶ 23.) In the spring of 2009, there were three major criminal incidents involving King's College students. On March 27, 2009, a student was attacked on Jackson Street and was stabbed in the back. (Doc. 139 at ¶ 24.) On March 28, 2009, an incident occurred in which a student sitting in front of the women's residence hall on campus was attacked by a young man who came running out from The Mines and the student's jaw was broken. *Id.* On April 5, 2009, a student claimed that a gun was put to his head on Union Street and a knife was put to the throat of the person with the gun. *Id.*

Numerous other criminal incidents involving students occurred near the King's

7

College campus around the same time. For example, on January 3, 2009, at about 2:05am, College security observed a fight that broke out as a crowd was exiting from The Mines. *Id.* at ¶ 26. On February 21, 2009, College security issued another report related to a fight in which The Mines security personnel attempted to break up a fight and disperse the crowd. *Id.* at ¶ 27. On March 13, 2009, College security issued another report related to a fight which occurred in front of The Mines where an ambulance transported a person from the scene. *Id.* at ¶ 28. On April 3, 2009, King's College security issued another report related to an incident in which a gun was fired from a car in the vicinity of a group of students. *Id.* at ¶ 30. During this time period, King's College received numerous letters and complaints from staff, parents, and students regarding the criminal incidents happening near campus, including threats to leave the College. *Id.* at ¶¶ 31-39. Some King's College students felt the need to carry weapons, such as knives, because they felt unsafe. (Doc. 137-4, P. Ex. 313.)

In addition, residents on the King's College campus experienced disruptive noise levels at closing time outside The Mines. Father O'Hara received reports from Defendant McGonigle that female students in Esseff Hall would continually complain that it was hard to sleep at 2:00 in the morning. (Doc. 139-1 at 73:1-9.) As a resident in campus housing, Father O'Hara also personally experienced loud noises, especially when The Mines was closing. *Id.* at 68:20-25. Frank Germano, one of the managers at The Mines, admitted that closing time could be noisy. (Doc. 139-19 at 109:4-13.) Mr. McGonigle contacted the Pennsylvania Liquor Control Board ("PLCB") to ask them about the issue of noise coming from The Mines, but was advised that the noise and fights needed to be addressed by the Wilkes-Barre police. (Doc. 139-2 at 95:24-97:9.) Father O'Hara never had any conversations with the PLCB concerning The Mines. (Doc. 139-1 at 75:8-13.)

8

As a result of these incidents, and in response to growing concerns about student safety, King's College scheduled a student forum on April 14, 2009. (Doc. 139 at ¶ 45; Doc. 139-1, P. Ex. 83.) In an April 4, 2009 email discussing the potential scheduling of the forum, Mr. McGonigle provided a list of ten questions he believed would be raised at the forum by students or parents, which includes the questions "why has the college not got the mines closed," "why has the city let the mines operate and do not take preventive action with the mines," "what has the college done about the mines as far as the city," and "knowing the mines is a problem why does not the city have police outside." (Doc. 139-1, P. Ex. 86; Doc. 139-2 at 114:25-115:4.) It was anticipated that College officials would clarify in response to these questions that they had no ability or intention to close down The Mines. (Doc. 139-2 at 114:20-117:1.) The email also lists as one of the suggested goals for the forum that the City, the police, and "some senior staff members [] discuss the problems between working with the LCB and police on the mines." (Doc. 139-1, P. Ex. 86.)

On April 8, 2009, Father O'Hara met with Mayor Leighton and Chief Dessoye to discuss the growing violence in the area and the concerns of students and parents. (Doc. 139 at ¶ 47.) Father O'Hara told Mayor Leighton that students felt that police needed to be more proactive in addressing incidents in the neighborhood. *Id.* at ¶ 48. At that time, the Defendants' communications did not address The Mines specifically. *Id.* at ¶ 50.

Also on April 8, 2009, Father O'Hara met with Mr. Greco, Lisa McCauley, Janet Mercincavage, and Mr. McGonigle. (Doc. 137-9 at 178:9-19.) At the meeting, Mr. Greco and Father O'Hara agreed that crime in Wilkes-Barre was increasing, and agreed to work together so that both The Mines and King's College could flourish. (Doc. 137-15 at 134:21-23, 161:3-9.) Mr. Greco told Father O'Hara "[w]e keep minority trouble out – however, we

can't stop them. They are all well behaved inside – what happens outside is not under our control – we can't control the streets." (Doc. 137-15, P. Ex. 96.)

A notice was sent to the College community announcing the scheduled student forum. The notice did not indicate that the incidents were related to the Mines. Doc. 139-1, P. Ex. 83.) The notice did state that "those students living in Alumni and Esseff halls who are disturbed by noise from the Mines [] are urged to contact 911." *Id.* Following the forum, Father O'Hara sent an email to his colleagues detailing next steps in light of the community input at the forum. (Doc. 139-1, P. Ex. 236.) The email does not mention The Mines. *Id.*

Chief Dessoye attended the forum. (Doc. 139-9 at 236:5-10.) Mayor Leighton did not attend the forum, but understood that the purpose of the forum was to "address the crime situation in the area of King's campus in the neighborhood." (Doc. 139-8 at 146:5-15.) Sheriff Savokinas was not aware of the forum. (Doc. 144-3 at 75:23-76:6.)

At the forum, City representatives did not provide any details about what they intended to do in response to the incidents. (Doc. 139-1 at 141:11-23.) Mayor Leighton and Chief Dessoye did not tell College Defendants how the City would respond, and Father O'Hara "did not feel that [he] had the right to tell them how to enhance their monitoring." *Id.* at 81:7-25. Father O'Hara did not meet with Mayor Leighton and Chief Dessoye again, and Mayor Leighton did not specify how the issue would be addressed in subsequent phone calls between himself and Father O'Hara. *Id.* at 80:25-81:5, 82:5-15. Father O'Hara had no discussions with Mayor Leighton about closing The Mines. *Id.* at 133:25-134:3. Similarly, Mr. Murphy did not advise Father O'Hara of anything the City intended to do to address the College's concerns. *Id.* at 84:23-85:16. Although King's College requested increased police presence and patrols, the College did not specifically ask for saturation patrols. (Doc. 139-2 at 217:5-11; Doc. 139-8 at 139:1-9.)

**E. Increased Police Presence in the Area of The Mines**

Police presence increased in and around the area on North Main Street between Union and North Streets about a month prior to the events of April 30, 2009. (Doc. 144-7 at 27:21-29:12.) Patrols were increased in response to general complaints from the neighborhood surrounding King's College, as well as reports from police officers that there was an increase in crime in the area. (Doc. 137-6 at 124:24-125:13.) A police car was parked near The Mines on days when The Mines was not open. (Doc. 137-2 at 27:17-19.)

The Wilkes-Barre Police Department held a seatbelt check on North Main Street in May 2009. (Doc. 137-12 at 170:20-171:7.) King's College is located on North Main Street and owns buildings on the same block as The Mines. (Doc. 137-9 at 74:20-75:3.) A college is considered a "perfect location" for a seatbelt check because statistically, college students do not wear their seatbelts as often as the rest of the population. (Doc. 137-12 at 171:19-172:11.) Seatbelt checks are often used in high crime areas to give police visibility. *Id.*

Parking meters in front of The Mines were covered with orange bags in April 2009 to reserve parking spaces in case an emergency response was needed again following the March 27, 2009 incident. (Doc. 137-6 at 116:15-118:14.)

**F. PLCB Proceedings**

In late March or early April 2009, the PLCB received a complaint from Mr. McGonigle regarding "the element The Mines [was] bringing into the neighborhood." (Doc. 144-15, p. 65a-66a.) Agent Rutkowski of the PLCB, who received the complaint, said he understood the "element" to be the "fights, disorderly conduct, [and] public urination" occurring near The Mines. *Id.* On April 25, 2009, a Saturday night, Agent Rutkowski went to The Mines and could not immediately enter the premises because there was a fight outside the entrance in which the Wilkes-Barre police had arrested two people. *Id.* at 56a.

**G. Saturation Patrol on the Night of April 30, 2009**

On April 30, 2009, the Wilkes-Barre Police Department carried out a "saturation patrol"[1] in the area of North Main Street. (Doc. 137-12 at 44:18-25.) The saturation patrol was in response to the incident on March 27, 2009, in which officers were surrounded by a large crowd. (*Id.* at 58:23-59:15; 276:3-279:18; Doc. 137-6 at 65:2-16.) Since "there was no disputing" that the individuals on that date were coming from The Mines, Chief Dessoye made the area surrounding King's and The Mines the "heart of the operation." (Doc. 137-12 at 279:1-3.) However, the saturation patrol covered the full two-block area where The Mines was located, including Senuna's, Gonda's, and Beer Boys. (*Id.* at 165:3-10; Doc. 137-6 at 66:7-23, 189:13-20.) The Luzerne County Sheriff's Office, Pennsylvania State Police Gang Division, and Pennsylvania Liquor Control Board, among other agencies, participated in the saturation patrol. (Docs. 139-15 at 12:4-11, 29:24-31:8;144-7 at 44:3-6, 56:16-21.) Mayor Leighton did not help to plan or coordinate the saturation patrol. (Doc. 137-34 at 103:7-12.)

The patrol officers on the night of April 30, 2009, were instructed to establish a presence "just to be there in case there was a repeat incident from a couple nights ago where a large crowd came out and started fighting, and it was to prevent any criminal activity, drugs, disorderly [sic], public urination, whatever." (Doc. 137-6 at 123:6-13.)

Sheriff Savokinas indicated that the County was asked to participate in one saturation patrol "in the area of King's College" by Chief Dessoye. (Doc. 139-15 at 12:4-11, 29:24-31:8.) Sheriff Savokinas understood the reason for the City's request was that there was high crime in the area and it was going to be a multi-jurisdictional operation. (Doc. 144-3 at 30:18-25.) The Sheriff's Office was asked to participate in saturation patrols numerous times during Sheriff Savokinas' tenure by many police departments. (Doc. 137-23 at 21:12-

---

[1] A saturation patrol is generally "an increase in police presence in specific neighborhoods to address criminal activity, trends, or excessive complaints." (Doc. 137-6 at 55:10-16.)

16.) Sheriff Savokinas never turned down such a request. (Doc. 144-3 at 28:16-25.) On the date of the saturation patrol, Chief Dessoye told Sheriff Savokinas the saturation patrol was in response to violent incidents "in the area of King's College." (Doc. 137-23 at 38:13-39:16.) Chief Dessoye asked Sheriff Savokinas to have a presence in front of King's College and act in the event of any criminal activity. (Doc. 137-23 at 39:8-40:3.)

Jennifer Roberts, a Deputy in the Luzerne County Sheriff's office, testified that several Wilkes-Barre police officers said during the saturation patrol that they did not want "these kind of people in our town," which she took to mean black and Hispanic people due to the racial makeup of the crowd that frequented The Mines. (Doc. 144-7 at 61:9-63:13.)

Wilkes-Barre police officers and the Sheriff's department did not interfere with patrons entering any of the establishments that were subjected to the police presence. (Doc. 137-12 at 294:15-295:2; Doc. 137-22 at 72:5-17; Doc. 137-23 at 64:7-8, 89:16-21, 91:1-3; Doc. 144-3 at 89:16-90:17.) None of the other bars in the area complained about the police presence. (Doc. 137-12 at 289:14-292:17.)

There were saturation patrols at other bars in Wilkes-Barre, including the Hardware Bar, Chu's,[2] Desi's, Liam's, Airey Tavern, and several others. (Doc. 137-6 at 42:11-43:22, 74:15-77:16.) Deputy Chief Crane participated in saturation patrols at six or seven bars during his career. (Doc. 139-10 at 74:15-75:2.) There was at least one saturation patrol at the Hardware Bar. (Doc. 137-6 at 76:19-77:16; 233:12-21.) Such a saturation patrol would have involved "[e]xtra police patrols, as many as [police] felt needed or could get at the time, if officers were available; could be two, three, four." *Id.* at 76:25-77:3.

## H. Denial of Development Benefits

Mr. Greco purchased the mortgage of the "defunct" Wilkes-Barre City Steam

---

[2] While Defendants' brief spells the name of this bar "Chews," the deposition transcript says "Chu's." For consistency, I have used the spelling indicated by the factual record.

Authority. (Doc. 137-29 at 28:4-7.) The steam heat piping covers 90% of buildings in the twenty-block grid of the core of Wilkes-Barre. (Doc. 137-29 at 39:15-17.) Mr. Greco planned to use the abandoned water in mines under the City for geothermal heating and cooling. *Id.* at 39:18-23.) However, based upon drawings of the mining system, there were no mines located under the city from which the water could be drawn. (Doc. 137-1 at 92:22-93:14.)

CORIX, a geothermal and water utility company, was a potential investor in the proposed project. (Doc. 137-29 at 45:12-14.) Support from the City and the KOZ designation were prerequisites for CORIX's investment. *Id.* at 51:11-14. A feasibility test, performed by CORIX, would cost about $125,000. (Doc. 137-29 at 45:10-18.) Although CORIX was ready to invest $30 million in the geothermal project, such that $125,000 "wasn't anything to them," CORIX was not willing to put forward the $125,000 for the feasibility study. (Doc. 137-31 at 146:13-16.) Mr. Greco explained that this was because the inability to obtain $125,000 from the various governments involved would indicate a lack of commitment to the project from the community. (Doc. 137-31 at 145:8-146:20.)

State Representative Eddie Day Pashinski initially supported the project and told Mr. Greco to apply for grant money. (Doc. 137-7 at 25:10-14, 38:19-23.) The applications were available to the public online through the Pennsylvania Department of Environmental Protection's ("DEP") website. *Id.* Greco missed the deadline. *Id.* at 38:24-39:10.

Rep. Pashinski learned the project would cost "a lot more money" than originally projected. *Id.* at 92:1-4. It was determined that the initial concept was flawed. *Id.* at 92:17-23. He informed Mayor Leighton and Wilkes-Barre City Administrator Marie McCormick that the state would not fund the geothermal project study. (Doc. 137-34 at 224:17-225:10.) As a result, Mayor Leighton believed the project was no longer feasible. *Id.* at 285:11-25.

The DEP requested a 50% match in order to qualify for the 50% grant of $62,500.

(Doc. 137-7 at 67:18-24.) The matching funds were never procured. *Id.* at 90:23-91:7. Rep. Pashinski believed the City did not apply for the remaining $62,500 because of "controversy relative to the [] feasibility" of the project. *Id.* at 91:8-23. Since the state did not match the grants, the City would not apply for federal funds for the project. (Doc. 137-21 at 21:21-25.)

The City Council relied on Butch Frati to assess the feasibility of the project due to his knowledge of the city's infrastructure. (Doc. 137-35 at 45:1-22.) Mr. Frati needed more information to make a judgment, but did not receive it. (Doc. 137-1 at 58:13-59:17.) Mr. Greco provided drawings of the steam heat system from the 1970s, 1980s, and 2000. *Id.* at 88:25-89:14. However, Mr. Frati knew that large sections of the system had been removed in 2005 or 2006, and other portions had been removed throughout his 25-year career. *Id.* at 89:15-90:24. After a meeting on November 9, 2009, Mr. Frati requested by letter more information from Mr. Greco in order to approve grant money for the feasibility test. (Doc. 137-29, Ex. 1.) Mr. Greco did not respond. (Doc. 137-29 at 59:5-23.) Mr. Frati never received a financial model, information regarding the extraction or utilization of abandoned mine water, information about the current status or condition of the steam heat infrastructure, or a list of businesses that were interested in utilizing the project. (Doc. 137-1 at 123:4-124:2.) Mr. Frati found major issues with extracting mine water for the project, and Mr. Greco never addressed his concerns. (Doc. 137-1 at 93:10-96:7.) The project was never presented to City Council for grant application approval. (Doc. 137-35 at 91:25-92:9.)

## I. Denial of Keystone Opportunity Zone Extension

The Keystone Opportunity Zone ("KOZ") program exempted property owners from state and local taxes on properties developed to bring business to the area. (Docs. 137-30 at 616:11-16, 137-34 at 176:6-16.) Mr. Greco's properties were originally granted KOZ status, but were denied an extension of that status in June 2009. (Doc. 137-21 at 53:21-

54:4.) Properties eligible for KOZ renewal or extension were determined by Mayor Leighton and his staff. (Doc. 137-34 at 170:10-16.) Factors considered included (a) how the property would enhance the City; (b) how the property would enhance employment opportunities; (c) how the property would create a better atmosphere; (d) safety to the neighborhoods where the property was located; and (e) removing blight. (Doc. 137-34 at 175:24-176:5.) All properties that were granted KOZ status or an extension were viable or potentially viable to Mayor Leighton and his staff. (Doc. 137-34 at 217:1-18.) Mr. Greco had maintained, but not developed, the properties during their KOZ status. (Doc. 137-29 at 205:7-11.)

Mr. Greco's properties were not included on the list of properties designated for KOZ extension submitted to the City Council in 2009. (Doc. 137-35 at 72:1-8.) The group that discussed KOZ extensions included Mayor Leighton, Mr. Murphy, and Mr. Frati. (Doc. 137-21 at 72:24-73:3.) The City Council votes for or against the entire list of parcels that are up for consideration of KOZ status renewal as a whole, not each property individually. (Doc. 137-24 at 50:20-51:13; 137-35 at 28:24-25.) The City Council has no control over which properties are on the list. (Doc. 137-35 at 47:19-20.)

### I. Mr. Greco's Misprision Conviction

Mr. Greco pleaded guilty on May 7, 2010, to the felony of misprision[3] for failing to disclose Luzerne County Commissioner Greg Skrepnak's failure to pay him back for a number of televisions Mr. Greco had bought for a bar owned by Mr. Skrepnak's father. (Doc. 137-31, P. Ex. 258; Doc. 137-31 at 9:13-11:4.) Mr. Greco did not receive a plea deal. (Doc. 137-31 at 134:4-8.) He was sentenced to two years probation and fifty hours of community service and fined $10,000. (Doc. 36.) He is also prohibited from maintaining direct control

---

[3] "Whoever, having knowledge of the actual commission of a felony [], conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both. 18 U.S.C. § 4.

over the businesses attached to his two liquor licenses. (Doc. 137-31 at 17:7-19:19.)

William Slavoski , who worked with the United States Attorney's Office, saw Michael Dessoye (Chief Dessoye's brother) meeting at a back room at the Beer Deli, a local delicatessen, with "people from the courthouse," the FBI, and the ADA office, including FBI Agent Joseph Noone. (Docs. 137-30 at 16-18; 137-38 at 84:6-85:8.) When Mr. Slavoski asked Chief Dessoye why the group was meeting, he responded "[d]on't even ask." *Id.* at 85:21-24. Mr. Slavoski did not overhear any of the group's conversation. *Id.* at 87:1-5.

## II. Procedural History

Plaintiffs filed this action on April 4, 2011. On March 19, 2012, I granted in part and denied in part motions to dismiss filed by City, College, and County Defendants. Plaintiffs filed an Amended Complaint on April 6, 2012. (Doc. 36.)[4] On August 16, 2012, I granted in part and denied in part Motions to Dismiss the Amended Complaint filed by City, College, and County Defendants. (Docs. 39; 40; 41.) Plaintiffs continued with the following claims.

As to the City Defendants: (1) The Mines' §§ 1983 and 1985 claims in Count I; (2) The Mines and Mr. Greco's §§ 1981 and 1982 claims in Count II against Mayor Leighton, Chief Dessoye, and the City of Wilkes-Barre; (3) The Mines' and Mr. Greco's § 1985 claims in Count II; (4) the Fourteenth Amendment claims in Count III; (5) the Fourteenth Amendment Due Process claim against the City of Wilkes-Barre, Mayor Leighton, and the City Council members in Count IV;[5] (6) the tortious interference with business relationships

---

[4] Count VI of the Amended Complaint was Count VII of the prior complaint.

[5] I dismissed Plaintiffs' Equal Protection claim under Count IV in my March 16, 2012 opinion because the date provided by Plaintiffs placed the time of the KOZ extension denial after Defendants learned of the felony charges against Mr. Greco, and Plaintiffs failed to allege that the extension was granted to other projects whose owners faced felony charges. (Doc. 31, pp. 25-26.) The date supplied by Plaintiffs was erroneous: Defendants in fact learned of the felony charges against Mr. Greco after their denial of the extension. Plaintiffs therefore included this claim in their Amended Complaint because the rationale for dismissing the claim no longer applied. (Doc. 36 at ¶ 113 n. 2.) Plaintiffs did not seek, nor were they granted, leave to amend this claim. Therefore, this claim remains dismissed.

claim in Count V against the individual City Defendants; and (7) Mr. Greco's claim against Mayor Leighton and Chief Dessoye in Count VI.

As to the County Defendants: (1) The Mines' § 1983 claim in Count 1; and (2) the Fourteenth Amendment Claims in Count III.

And, as to the College Defendants: (1) The Mines' §§ 1983 and 1985 claims in Count I; (2) The Mines' §§ 1981, 1982, and 1985 claims in Count II; (3) the Fourteenth Amendment claims in Count III; and (4) the tortious interference with business relationships claim in Count V.

Defendants moved for summary judgment on all of the above claims on January 15 and 16, 2018. Plaintiffs filed Briefs in Opposition on April 16, 2018, and Defendants filed Reply Briefs on May 15 and 16, 2018. These Motions are therefore now ripe for disposition.

### III. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary

judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citation omitted). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id*. (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). On summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## IV. Discussion

### A. Defendants' Statements of Material Facts will be Admitted

The Middle District of Pennsylvania provides in its Local Rules that:

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried. [] *All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.*

Local Rule 56.1. The purpose of this rule is to "structure a party's summary judgment legal and factual theory into a format that permits and facilitates the court's direct and accurate consideration of the motion." *Gantt v. Absolute Machine Tools, Inc.*, No. 06-1354, 2007 WL 2908254, at *3 (M.D. Pa. Oct. 4, 2007).

As Defendants point out, Plaintiffs have failed to comply with Rule 56.1's requirement that they respond to Defendants' statements of facts. Instead, Plaintiffs have submitted their own Statement of Facts, which contains 1,249 paragraphs and makes no reference to Defendants' Statements of Facts. Plaintiffs submitted an identical copy of this document in response to each of the Defendants' Statements of Facts. (*Compare* Docs. 160; 162; 164.)

The proper analysis in this situation was set forth in *Valley Rod & Gun Club v. Chesapeake Appalachia, LLC*:

> As required by this Court's Local Rule 56.1, Defendants' summary judgment motions were properly "accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." [] Plaintiff, however, did not respond to the numbered paragraphs set forth in the moving parties' statements, as required by the same Rule. Thus, Plaintiff failed to deny many of the assertions in Defendants' statements of facts. []
>
> Plaintiff did submit its own statement of facts, but, as already mentioned, it does not comport with LR 56.1. Thus, because Plaintiff's

statement of facts does not respond to Defendants' statements, "the court will adopt [Defendants'] statement[s] of facts, except for those facts *clearly* disputed by plaintiff with adequate record references." *U.S. ex rel. Paranich v. Sorgnard*, 286 F. Supp. 2d 445, 447 (M.D. Pa. 2003), *aff'd*, 396 F.3d 326 (3d Cir. 2005) (emphasis added).

No. 3:13-CV-0725, 2017 WL 1173930, at *6 (M.D. Pa. Mar. 29, 2017)(Caputo, J.), *appeal dismissed*, No. 17-1951, 2017 WL 5256217 (3d Cir. Sept. 8, 2017). Therefore, I will adopt Defendants' statements of facts except where Plaintiffs have clearly disputed them with adequate record references.

## B. Count I

The Defendants move for summary judgment on Count I of the Amended Complaint. The remaining claims under Count I are The Mines' § 1983 claim against all Defendants and The Mines' § 1985 claim against City and College Defendants. Count I alleges that all relevant Defendants "act[ed] in concert to subject plaintiffs and their businesses to far harsher law enforcement action than other businesses similarly situated (other than in the race of their clientele) in violation of said plaintiffs' right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution."

### 1. The Mines' § 1983 claim against all Defendants

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage [] subjects, or causes to be subjected, any citizen [] or other person [] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 749 n.9 (1999) (quoting *Baker v. McCollan*,

443 U.S. 137, 144 n.3 (1979)). To prevail in an action under § 1983, a plaintiff must demonstrate: (1) a violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).

The Equal Protection Clause directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. To prevail on an equal protection claim, "a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated." *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010)(internal quotation omitted). The Equal Protection Clause announces the "fundamental principal" that "the State must govern impartially." *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979). It "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "[T]o be similarly situated, the individuals with whom [the Plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Desi's Pizza, Inc. v. City of Wilkes-Barre*, No. 01-4800, 2006 WL 2460881, at *24 (M.D.Pa. Aug. 23, 2006). The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

"[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. [] Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977); *see also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003). "Discriminatory intent 'implies that the decision-

maker [] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005)(quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). Where a defendant makes a properly supported motion for summary judgment on a claim which requires proof of a wrongful motive, a plaintiff "must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). Evidence that a facially neutral law or policy is applied differently on the basis of race may be evidence of intentional discrimination. *Antonelli*, 419 F.3d at 274 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

### a. City Defendants

The record is devoid of evidence that City Defendants were motivated by a racially discriminatory purpose. The clientele of The Mines was estimated by Mr. Greco to be approximately 30-40% minority. Mr. Greco testified that Gonda's, a bar located directly next door to The Mines, was patronized by approximately 30% minority customers on nights The Mines was open, and that Senuna's, a bar one block away, was patronized by 1-2% minority customers. City Defendants introduced undisputed evidence that Gonda's and Senuna's experienced the same police presence as The Mines during the saturation patrol on April 30, 2009. In addition, at least one saturation patrol was coordinated at The Hardware Bar, which Mr. Greco estimated had about five percent minority customers during the relevant time. Uncontested testimony by Sheriff Savokinas establishes that the officers participating in the saturation patrol were informed that they were there to address incidents "in the area of King's College," rather than specifically at The Mines.

To the extent Mr. Greco argues that the police presence at The Mines constituted

an equal protection violation because it was larger than the saturation patrols performed near other bars, The Mines cannot establish that it was treated differently from any other similarly situated bars because no other bars had an incident like the crowd of people that surrounded police officers outside The Mines on March 27, 2009. Uncontested testimony from Chief Dessoye and Donald Crane establishes that this was the largest incident of this kind the Wilkes-Barre police had experienced since the late 1970s or early 1980s, and that the saturation patrol was planned in direct response to that event. Therefore, any difference in scale between the saturation patrol coordinated at The Mines and those coordinated at other bars is supported by the rational basis that the police needed to be sure they would not be outnumbered or surrounded again if a similar situation arose.

There is no evidence that the seatbelt check was directed at The Mines' customers or employees, or that the seatbelt check was motivated by racial animus rather than the area's location near King's College's campus and in an area which was experiencing an increase in criminal incidents. In addition, uncontested testimony establishes that the parking spots in front of The Mines were reserved in case of the need for an emergency response following the March 27, 2009 incident.

Finally, because The Mines is deemed to have admitted that Mayor Leighton and Chief Dessoye had no knowledge of the racial makeup of The Mines' clientele, the record cannot support an inference that these two Defendants acted on the basis of racial discrimination. In addition, there is no evidence at all of any involvement by the City Council Defendants, Mr. Frati, or Mr. Murphy in the police presence in the area of The Mines. City Defendants are therefore entitled to summary judgment on The Mines' § 1983 equal protection claim under Count I.

### b. College Defendants

As I have previously explained, College Defendants in this case are purely private parties. (Doc. 59, p. 17.) Thus, The Mines may only maintain a claim against College Defendants if it can establish facts "from which a conspiratorial agreement may be inferred," *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1377 (3d Cir. 1992). A plaintiff alleging a civil rights violation based on a conspiracy must "allege with particularity and present material facts which show that the purported conspirators reached some understanding or agreement or plotted, planned and conspired together to deprive plaintiff of a protected federal right." *Jean-Pierre v. BOP*, No. 06-2248, 2008 WL 755807, at *4 (M.D.Pa. March 19, 2008)(citing *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1377 (3d Cir. 1992))(additional internal citations omitted). The relevant federal right under Count I is the right to equal protection of the laws.

The record contains no evidence that College Defendants conspired with City or County Defendants to have The Mines shut down because of the race of its clientele. Father O'Hara met with Mayor Leighton and Chief Dessoye once, and the College expressed a desire for increased police presence in the area, but there is no evidence that the College Defendants made an agreement with City Defendants to attempt to have The Mines shut down, and there is certainly no evidence that College Defendants were motivated by the racial makeup of The Mines' customers. The announcement of the forum held on King's campus mentioned The Mines only in the context of noise complaints, an issue the manager of The Mines admitted was present at closing time. Mr. McGonigle's email listing as one of the suggested goals for the student forum that the City, the police, and "some senior staff members [] discuss the problems between working with the LCB and police on the mines" could support an inference on summary judgment that the College

viewed The Mines as a problem, but it provides no support for the contention that this view resulted from the racial makeup of The Mines' customers, rather than the numerous criminal incidents and complaints from the College community. Finally, it is undisputed that Father O'Hara and Mr. McGonigle had no knowledge of the racial makeup of The Mines' clientele. College Defendants are therefore entitled to summary judgment on Count I.

### c. County Defendants

The record contains few details of County Defendants' involvement in the saturation patrol of April 30, 2009, and none that could support an inference that County Defendants were motivated by racial animus. Nothing in the record suggests that Sheriff Savokinas, the only individual County Defendant, even knew the racial makeup of The Mines' customers. The undisputed record establishes that, in Sheriff Savokinas' understanding, the saturation patrol was being organized in response to rising crime in the area. Sheriff Savokinas testified that he participated in many such patrols during his tenure and never denied a request that his Department participate. Therefore, the record cannot support an inference that County Defendants' participation in the saturation patrol was motivated by racial animus, and County Defendants are entitled to summary judgment on this claim.

### 2. The Mines' § 1985 claim against City and College Defendants

Count I also states a claim against City and College Defendants under 42 U.S.C. § 1985. The Amended Complaint does not identify a particular subsection, but I will assume based on the facts that Plaintiffs' claim falls under § 1985(3). To state a claim under § 1985(3), a plaintiff must allege:

> (1) a conspiracy; (2) motivated by a racial [] discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971).

As explained above, the record does not contain evidence sufficient to support a reasonable inference that City and College Defendants entered into a conspiracy to shut down The Mines based on racial animus. The Mines' admission that Father O'Hara, Mr. McGonigle, Mayor Leighton, and Chief Dessoye were all unaware of the racial makeup of The Mines precludes such an inference, and even without this admission there is no evidence that any collaboration between City and College Defendants was based on racial animus, as opposed to the increasing crime rate in the vicinity of The Mines. City and College Defendants are therefore entitled to summary judgment on this claim.

### C. Count II

In Count II of the Amended Complaint, Mr. Greco and The Mines bring claims under 42 U.S.C. §§ 1981 and 1982 against the City, Mayor Leighton, and Chief Dessoye, and The Mines brings claims pursuant to 42 U.S.C. §§ 1981 and 1982 against the College Defendants. In addition, Mr. Greco and The Mines state a 42 U.S.C. § 1985 claim against all City Defendants, and The Mines states a 42 U.S.C. § 1985 claim against College Defendants. Mr. Greco and The Mines assert that all relevant Defendants acted "in retaliation against plaintiffs for welcoming Black and Latino persons as patrons at their establishment and [] as part of a custom and policy designed to drive such persons out of Wilkes-Barre and the neighboring communities." (Doc. 36 at ¶ 109.)

42 U.S.C. §§ 1981 and 1982 were passed as part of the "immediately post-Civil War legislative effort to guarantee the then newly freed slaves the same legal rights that other citizens enjoy." *CBOCS v. Humphries*, 553 U.S. 442, 448 (2008). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right [] to

make and enforce contracts [] as is enjoyed by white citizens."  Section 1982 provides, among other things, that "[a]ll citizens of the United States shall have the same right [] as is enjoyed by white citizens [] to inherit, purchase, lease, sell, hold, and convey real and personal property." Both statutes are construed similarly based on their "common language, origin, and purposes." *Humphries*, 553 U.S. at 448.  As I previously noted in the March 19, 2012 Memorandum, both statutes are applicable to the instant case. (Doc. 31, p. 16.)

Plaintiffs' claim in Count II is for retaliation pursuant to §§ 1981 and 1982. The Supreme Court determined in *Humphries* that both §§ 1981 and 1982 encompass "the claim of an individual (black or white) who suffers retaliation because he has tried to help a different individual, suffering direct racial discrimination, secure his § 1981 [or § 1982] rights." 553 U.S. at 445. "To establish retaliation [under § 1981], plaintiffs must show that the plaintiffs were (1) engaged in an activity protected under the anti-discrimination statutes, (2) the defendants were aware of plaintiff's participation in the protected activity, (3) the defendants took adverse action against plaintiffs based upon their activity, and (4) a causal connection existed between the plaintiffs' protected activity and the adverse action taken by defendants." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001). "[T]he elements of a *prima facie* case are the same under either § 1981 or § 1982." *Caddy v. J.P. Morgan Chase Bank*, 237 F. App'x 343, 346 n. 3 (10th Cir. 2007) (citing *Houston v. Benttree, Ltd.*, 637 F.2d 739, 741 (10th Cir. 1980)).

As stated *supra* in analyzing Plaintiffs' claims under Count I, the record does not support an inference that any of the Defendants acted with the requisite discriminatory intent. There is no evidence to suggest that Defendants' actions were based on The Mines' and Mr. Greco's protected conduct, rather than the increased crime in the area which they may or may not have believed centered around The Mines. Since there is no evidence that

any of the Defendants were motivated by discriminatory intent, the record cannot support an inference that Defendants entered into a conspiracy under § 1985 to deprive Mr. Greco or The Mines of their rights under §§ 1981 and 1982. Therefore, all relevant Defendants are entitled to summary judgment on Count II.

### D. Count III

Count III asserts a Fourteenth Amendment substantive due process claim based on the Defendants' alleged abuse of police power to destroy Plaintiffs' business, harassment and stigmatization of Plaintiffs, and deprivation of Plaintiffs' right to use property and pursue an occupation. (Doc. 36 ¶ 111.) The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property without due process of the law." U.S. Const. amend. XIV. The substantive component of the Due Process clause "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Newman v. Beard*, 617 F.3d 775, 782 (3d Cir. 2010) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). To establish a substantive due process violation, a plaintiff must prove: (1) the deprivation of an interest protected by the substantive due process clause; and (2) that the government's deprivation of that protected interest shocks the conscience. *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 190 (3d Cir. 2009)(citation omitted). Ownership and use of real property is an interest protected by substantive due process. *DeBlasio v. Zoning Bd. of Adjustment for Twp. of West Amwell*, 53 F.3d 592, 601 (3d Cir. 1995), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003). The standard of what is conscience shocking is subjective and depends on context, but "it is governmental conduct intended to injure that is most likely to rise to the conscience-shocking level." *Evans v. Sec'y of Pa. Dep't of Corr.*, 645 F.3d 650, 660 (3d Cir.

2011) (internal quotations omitted)(citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). "[A]llegations of corruption, self-dealing, [or] bias against an ethnic group" suggest conscience-shocking behavior. *Chainey*, 523 F.3d at 220 (3d Cir. 2008).

The record contains insufficient evidence to infer either that Defendants interfered with Plaintiffs' right to own and use the real property at The Mines or that Defendants' actions were conscience shocking. First, although Plaintiffs allege in their Amended Complaint that it was because of the increased police presence that they were unable to operate their nightclub more than sporadically, there is no evidence in the record that The Mines' difficulties drawing a crowd were due to the increased police presence over a few months' time rather than other potential causes, such as a lack of interest from customers, or King's College classes ending for the summer and resulting in a lack of student attendance. Second, a reasonable jury could not conclude that Defendants' behavior was conscience shocking because, as explained *supra*, the record does not support an inference that any Defendants acted with a discriminatory motive. Defendants are therefore entitled to summary judgment on this claim.

### E. Count IV

Count IV states a claim by Mr. Greco and the Development Corporations against the City, Mayor Leighton, and the City Council members for a Fourteenth Amendment substantive due process violation based on Defendants' actions in denying the KOZ extension and refusing to fund the geothermal project. The relevant legal standard is the same as that used in evaluating Count III. Even assuming, without deciding, that Plaintiffs have a substantive due process interest in securing tax benefits and grant money, the record contains insufficient evidence for a reasonable jury to conclude that Defendants' actions were conscience shocking. There is no evidence at all in the record that the

Defendants' actions were based on racial animus or on Mr. Greco's involvement with The Mines. Therefore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could not conclude that Defendants violated Plaintiffs' substantive due process rights. Defendants are therefore entitled to summary judgment on Count IV.

### F. Count V

In Count V, Plaintiffs assert a state law tortious interference with business relationships claim against Mayor Leighton, Chief Dessoye, Mr. Murphy, the City Council members, Mr. Frati, Father O'Hara, and Mr. McGonigle. (Doc. 36, ¶ 115.)   Since I will grant summary judgment on all of Plaintiffs' federal claims, I decline to exercise supplemental jurisdiction over the state law claim in Count V. *See* 28 U.S.C. § 1367(c)(3)("The district courts may decline to exercise supplemental jurisdiction [if] the district court has dismissed all claims over which it has original jurisdiction; *see also Byrd v. Shannon*, 715 F.3d 117, 128 (3d Cir. 2013)(affirming district court's decision to decline supplemental jurisdiction over state law negligence claims where it had granted summary judgment on all federal claims).

### G. Count VI

In Count VI, Mr. Greco alleges that Mayor Leighton and Chief Dessoye violated his Fifth and Fourth Amendment rights under 42 U.S.C. §§ 1981, 1982, 1983, and 1985. Specifically, Mr. Greco alleges that Mayor Leighton and Chief Dessoye "induced" FBI Agent Joseph Noone "to manipulate plaintiff Greco into becoming vulnerable to the charge of misprision." (Doc. 36 at ¶ 117.) Mr. Greco has clarified that this claim is based on a theory of selective prosecution. "The requirements for a selective-prosecution claim draw on ordinary equal protection standards. [] The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). The Third Circuit has

noted that "selective prosecution may constitute illegal discrimination even if the prosecution is otherwise warranted." *Desi's Pizza, Inc. v. City of Wilkes-Barre*, 321 F.3d 411, 425 (3d Cir. 2003)(internal citations omitted).

As Defendants point out, the Due Process Clause of the Fifth Amendment applies only to federal actors. *Damiano v. Scranton Sch. Dist.*, 135 F.Supp.3d 255, 266 (M.D.Pa. 2015). Neither party has briefed the issue whether Mr. Greco is able to state a claim for Fifth Amendment due process violations by alleging that Mayor Leighton and Chief Dessoye conspired with Agent Noone to have him prosecuted, since Agent Noone is a federal actor. Even assuming, without deciding, that Mr. Greco could state a claim under this theory, the record contains no evidence from which a rational inference could be drawn that Mayor Leighton and Chief Dessoye made any attempt to influence the decisions of federal prosecutors to pursue the case against Mr. Greco. Mr. Greco argues only that "[t]he King's College Alumni had a common vested interest in King's College," and that Chief Dessoye was once seen eating lunch with Agent Noone. Based on these facts, no rational jury could infer that Mayor Leighton or Chief Dessoye attempted to influence Agent Noone, let alone that they did so based on a racially discriminatory motive. Defendants are therefore entitled to summary judgment on Count VI.

### V. Conclusion

For the above stated reasons, Defendants will be granted summary judgment on Counts I, II, III, IV, and VI, and Count V will be dismissed. An appropriate order follows.

August 8, 2018                                      /s/ A. Richard Caputo
Date                                                A. Richard Caputo
                                                    United States District Judge