**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RITTENHOUSE ENTERTAINMENT, INC., *et al.*, | : | Civil No. 3:11-CV-00617 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF WILKES-BARRE, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## MEMORANDUM

This is a civil rights case that is currently before the court on remand from

the United States Court of Appeals for the Third Circuit with instructions to

consider whether Defendants are entitled to qualified immunity and whether

Defendants are entitled to summary judgment as to Plaintiffs' tortious interference

with a contract claim. For the reasons that follow, summary judgment as to the

remaining Defendants is granted in part and denied in part.

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Thomas J. Greco ("Greco") is the owner or principal of several

companies, including Rittenhouse Entertainment, Inc. ("Rittenhouse"), The Mines,

Inc. ("The Mines"), G Net Comm. Co. Inc. ("G Net"), and Phoenix Estates

("Phoenix"), all of which are named as plaintiffs in this action. (*See* Doc. 36 ¶¶ 1–

5.) The facts of this case primarily concern The Mines, which is the owner and

operator of a nightclub of the same name located in Wilkes-Barre, Pennsylvania.[1] (*Id.* ¶ 2.) Plaintiffs allege generally that Defendants have acted in a concerted effort to violate The Mines' constitutional rights by selectively enforcing state and local laws against The Mines and that this selective enforcement was motivated by racial animus due to the fact that The Mines served significantly more Black and Hispanic customers than other similarly situated nightclubs in the same geographic area.

Plaintiffs first filed suit on April 4, 2011, bringing eight claims for relief against seventeen defendants. (Doc. 1.) The named defendants were the City of Wilkes-Barre ("Wilkes-Barre" or "the City"); Thomas Leighton ("Leighton"), who was the mayor of the City at all times relevant to this case; Gerry Dessoye ("Dessoye"), who was the City's chief of police at all relevant times; J.J. Murphy ("Murphy"), who was the city administrator at all relevant times; Butch Frati ("Frati"), who was the City's director of operations at all relevant times; Tony Thomas, Jr., Kathy Kane, William Barrett, Rick Cronauer, and Michael Merritt (collectively referred to as "the City Council Defendants"), who all served on the Wilkes-Barre City Council during the period of time relevant to this case; King's College, which is a private college located across the street from The Mines in

---

[1] The court will refer to both the corporation and the nightclub collectively as "The Mines" throughout this opinion.

2

Wilkes-Barre; Thomas J. O'Hara ("O'Hara"), who was the president of King's College at all relevant times; Robert McGonigle ("McGonigle"), who was associate vice president for student affairs and the dean of students at King's College at all relevant times; Paul Lindenmuth ("Lindenmuth"), who was the chair of King's College's criminal justice and sociology department at all relevant times; John McAndrew ("McAndrew"), who was the King's College director of public relations[2] at all relevant times; Luzerne County ("Luzerne County" or "the county"); and Michael Savokinas ("Savokinas"), who was the sheriff of Luzerne County at all relevant times. (Doc. 1, ¶¶ 6–18; Doc. 139, ¶ 139.)

Defendants divided into three separate groups, all of which moved to dismiss the complaint. The City Defendants (Wilkes-Barre, Leighton, Dessoye, Murphy, Frati, Thomas, Kane, Barrett, Cronauer, and Merritt) moved to dismiss the complaint on June 6, 2011. (Doc. 12.) The College Defendants (King's College, O'Hara, McGonigle, Lindenmuth, and McAndrew) moved to dismiss on the same day. (Doc. 13.) The County Defendants (Luzerne County and Savokinas) moved to dismiss on June 15, 2011. (Doc. 15.)

---

[2] The complaint identifies McAndrew as the King's College dean of students, but the record indicates that McAndrew's actual position was director of public relations. (*See* Doc. 139, ¶ 139.)

United States District Judge A. Richard Caputo granted the motions to dismiss in part and denied them in part on March 19, 2012, and granted Plaintiffs leave to file an amended complaint. (Docs. 31, 32.) Plaintiffs filed their amended complaint on April 6, 2012. (Doc. 36.)

In the amended complaint, which remains the operative pleading in this case, Plaintiffs raised six causes of action against the Defendants. In Count I, Plaintiffs raised a claim under 42 U.S.C. §§ 1983 and 1985 for violation of the Equal Protection Clause under the Fourteenth Amendment. (*Id.* ¶¶ 103–07.) In Count II, Plaintiffs raised a claim for retaliation in violation of the Fourteenth Amendment under 42 U.S.C. §§ 1981, 1982, and 1985. (*Id.* ¶¶ 108–09.) In Count III, Plaintiffs raised a claim for violation of their right to substantive due process under the Fourteenth Amendment. (*Id.* ¶¶ 110–11.) In Count IV, Plaintiffs Greco, G Net, and Phoenix Estates raised due process and equal protection claims arising from the City Defendants' alleged interference with the Plaintiffs' efforts to secure benefits and development funding under the Keystone Opportunity Zone ("KOZ") program. (*Id.* ¶¶ 112–13.) In Count V, Plaintiffs raised several state tort law claims against all individual City and College Defendants, including tortious interference, trade disparagement, and defamation. (*Id.* ¶¶ 114–15.) In Count VI, Plaintiff Greco raised a claim for retaliation against Defendants Leighton and Dessoye, alleging that they had selectively prosecuted him for a felony in

retaliation for his complaints regarding the City's treatment of The Mines. (*Id.* ¶¶ 116–20.)

All defendants moved to dismiss the amended complaint on April 20, 2012. (Docs. 39–41.) Judge Caputo addressed the motions through a memorandum and order on June 4, 2012, granting the motions in part and denying them in part. (Docs. 59–60.) Specifically, Judge Caputo: (1) dismissed Count I of the amended complaint to the extent that it was raised by Plaintiffs Greco and Rittenhouse; (2) dismissed Count I to the extent that it raised a § 1985 claim against the County Defendants; (3) dismissed Count II to the extent that it was raised against the County Defendants; (4) dismissed Count II to the extent that it was raised by Plaintiff Rittenhouse; (5) dismissed Count II to the extent that it raised § 1981 and § 1982 claims against the City Council Defendants, Defendant Murphy, or Defendant Frati; and (6) dismissed Count V to the extent that it raised trade disparagement and defamation claims.[3] (Doc. 59.) Defendants then answered the amended complaint on September 6, 2012. (Docs. 62–64.)

Following the close of fact discovery, all three groups of Defendants moved for summary judgment as to all remaining claims. (Docs. 135, 138, 141.) Judge

_____

[3] The trade disparagement and defamation claims had actually been dismissed in Judge Caputo's earlier opinion and his August 16, 2012 order simply confirmed that they were dismissed. The claims are nonetheless included in this summary of the August 16, 2012 opinion to aid the reader's understanding of the procedural history of this case.

Caputo addressed the motions for summary judgment in a memorandum and order on August 8, 2018. (Docs. 201–02.) Judge Caputo granted summary judgment as to all remaining federal claims and declined to exercise supplemental jurisdiction over the remaining state law claim in light of his grant of summary judgment on the federal claims. (Doc. 201.) Plaintiffs appealed. (Doc. 203.)

On appeal, the Third Circuit vacated and remanded in part and affirmed in part. *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 782 F. App'x 148, 150 (3d Cir. 2019). The Third Circuit found that summary judgment was inappropriate as to the claims raised in Counts I, II, and III against the City and College Defendants and accordingly vacated and remanded for further proceedings on those claims. *Id.* at 153–54. The Third Circuit affirmed the grant of summary judgment as to all claims raised against the County Defendants and all claims raised in Counts IV and VI. *Id.* at 155–56. Because the Third Circuit vacated and remanded as to some of Plaintiffs' federal claims, the court additionally vacated Judge Caputo's decision to decline to exercise supplemental jurisdiction over the tortious interference claim and remanded for further proceedings on that claim. *Id.* at 156 n.6. The Third Circuit accordingly instructed the district court on remand to consider two issues that had been raised before Judge Caputo but on which Judge Caputo had not ruled: (a) whether the City Defendants are entitled to qualified immunity as to the

remaining federal claims and (b) whether the remaining Defendants are entitled to summary judgment as to Plaintiffs' tortious interference claim. *Id.* at 156 nn.5–6.[4]

Following remand from the Third Circuit, the case was reassigned to the undersigned on June 1, 2020. The court ordered supplemental briefing on the qualified immunity and tortious interference issues on June 17, 2020. (Doc. 215.) Defendants[5] filed briefs arguing that they should be granted summary judgment on August 14, 2020 and August 17, 2020. (Docs. 221–22.) Plaintiffs filed opposition briefs on September 11, 2020. (Docs. 225–26.) Defendants filed reply briefs on October 9, 2020 and October 23, 2020. (Docs. 236–37.) Accordingly, the

---

[4] To recap, and to aid the reader's understanding of the procedural posture of the case, the case proceeds on remand from the Third Circuit's decision as to the following claims:

1. Count I to the extent that it is raised by The Mines against all City and College Defendants other than Lindenmuth and McAndrew.
2. Count II to the extent that it is raised by The Mines and Greco against Defendants Wilkes-Barre, Leighton, and Dessoye.
3. Count II to the extent that it is raised by The Mines and Greco against Defendants Murphy, Frati, Thomas, Kane, Barrett, Cronauer, and Merritt under 42 U.S.C. § 1985 only.
4. Count II to the extent that it is raised by The Mines and Greco against all College Defendants other than Lindenmuth and McAndrew, except that Greco's claim under § 1985 is dismissed.
5. Count III to the extent that it is raised by The Mines, Greco, and Rittenhouse against all City and College Defendants other than Lindenmuth and McAndrew.
6. Count V to the extent that it raises a tortious interference claim against the individual City and College Defendants other than Lindenmuth and McAndrew.

[5] Because the County Defendants have been granted summary judgment as to all remaining claims, the court will collectively refer to the City Defendants and the College Defendants as "Defendants" throughout the remainder of this opinion.

qualified immunity and tortious interference issues are ripe for the court's disposition.

## JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1331, which allows a district court to exercise subject matter jurisdiction in civil cases arising under the Constitution, laws, or treaties of the United States, and 28 U.S.C. § 1367, which gives district courts supplemental jurisdiction over state law claims that are so closely related to federal claims as to be part of the same case or controversy.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary." *Id.* "'A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case.'" *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## MATERIAL FACTS

Under Local Rule 56.1, a party moving for summary judgment must include a separate, short and concise statement of material facts, and the party opposing summary judgment must include a statement responding to the moving party's statement. M.D. Pa. L.R. 56.1. In this case, Defendants filed statements of material facts in support of their motions for summary judgment, *see* Docs. 137, 139, 143, but Plaintiffs did not file statements that responded to the Defendants' statements. Instead, Plaintiffs filed their own independent statement of material facts, which they separately filed in response to all three motions for summary judgment. (*See* Docs. 160, 162, 164.) In light of Plaintiffs' failure to comply with Local Rule 56.1, Judge Caputo previously ruled that the factual allegations in

Defendants' statements of material facts would be deemed admitted "except where Plaintiffs have clearly disputed them with adequate record references." (Doc. 201, p. 21.)[6] The Third Circuit upheld this ruling on appeal. *Rittenhouse*, 782 F. App'x at 151 n.3. Accordingly, for purposes of the current summary judgment discussion, Defendants' statements of material facts are deemed admitted except where Plaintiffs have clearly disputed them with adequate record references. (Doc. 201, p. 21.) The court accordingly turns its attention to the facts that are material to the instant summary judgment discussion.

Prior to the events at issue in this lawsuit, The Mines was open on Thursday, Friday, and Saturday nights. (Doc. 137, ¶ 21.) Plaintiff Greco estimated that approximately 30–40% of The Mines' customers were Black or Hispanic, while James Sperazza, who handled security for The Mines, estimated that 30% of the club's customers were Black or Hispanic. (*Id.* ¶¶ 75–76.) A comparable bar in the area, The Hardware Bar, only had approximately 20% minority customers. (*Id.* ¶ 79.) Wilkes-Barre police were called to The Hardware Bar more often than they were called to The Mines, and the Wilkes-Barre Police Department directed more resources towards The Hardware Bar than The Mines. (*Id.* ¶ 80.)

---

[6] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

Fights sometimes occurred outside of The Mines when it closed for the night, which Greco witnessed and helped to break up. (*Id.* ¶¶ 30–31.) When employees could not control a fight outside The Mines, the local police would be called. (*Id.* ¶ 36.) As a result, the Wilkes-Barre police came to the Mines fairly frequently. (*Id.* ¶ 37.)

Violent crime in Wilkes-Barre was increasing in 2009. (*Id.* ¶ 61.) This included stabbings in the neighborhood around The Mines and large fights that occurred behind the building in which The Mines was located. (*Id.* ¶ 68.) The Mines regularly turned away customers who were wearing gang colors, customers who were suspected of criminal activity, and customers who were carrying weapons. (*Id.* ¶¶ 42–56, 69–70.)

On January 16, 2009, four individuals were arrested outside of The Mines for disorderly conduct, involving fighting and yelling. (*Id.* ¶ 95.) Later that night, at approximately 2:11 a.m., a fight broke out outside of The Mines, which resulted in a crowd of approximately 100–150 people. (*Id.* ¶ 96.) Several other arrests were made outside The Mines later that month. (*Id.* ¶¶ 97–101.)

On March 6, 2009, a large fight occurred outside of The Mines. (*Id.* ¶ 102.) Eleven police officers responded to the fight, and a crowd of approximately 100 people amassed around the fight. (*Id.* ¶¶ 102–03.) Several other arrests and other incidents requiring police responses followed later that month. (*Id.* ¶¶ 104–11.)

A second large fight broke out on March 27, 2009. (*Id.* ¶ 112.) Accounts differed as to how many people were involved in the fight. (*Id.*; Doc. 160, ¶ 89.) Police who observed the fight reported that there were about 200 people involved, but Greco, who had also observed the fight, reported that there were less than 50 people involved. (Doc. 137, ¶ 112; Doc. 160, ¶ 89.) Wilkes-Barre police officers responding to the fight were surrounded by a crowd of people and had to call for backup from the Pennsylvania state police as well as the township police departments of Kingston, Plains, and Wilkes-Barre townships. (Doc. 137, ¶ 113.) The officers felt that they needed to call for backup because they were surrounded and outnumbered by the crowd. (*Id.* ¶ 115.) Eleven police cruisers from the other departments responded to the scene and arrested five individuals. (*Id.* ¶ 114.)

Another fight occurred outside The Mines the next night, on March 28, 2009. (*Id.* ¶ 116.) Several police officers responded to the scene, and the men involved in the fight fled. (*Id.* ¶ 119.) Several other arrests and violent incidents followed in April 2009 and subsequent months. (*Id.* ¶¶ 120–40.)

Around this same time and beginning in the fall of 2008, there was an increase in criminal incidents involving King's College students. (Doc. 139, ¶ 23.) On March 27, 2009, a student was stabbed in the back on Jackson Street. (*Id.* ¶ 24.a.) On March 28, 2009, a student sitting outside of the women's residence hall on the King's College campus was attacked by a young man who had come

running out of The Mines.  (*Id.* ¶ 24.b.)  The student's jaw was broken as a result of the incident.  (*Id.*)  On April 3, 2009, a gun was fired from a car in the vicinity of a group of King's College students.  (*Id.* ¶ 30.)  On April 5, 2009, a student was held up at gun point on Union Street.  (*Id.* ¶ 24.c.)  Some students and parents threatened to leave King's College as a result of the violent incidents that had occurred near the college, and the college received several complaints about violence around the college.  (*Id.* ¶¶ 31–39.)

To address students' concerns, King's College scheduled a student forum to discuss student safety.  (*Id.* ¶¶ 45–46.)  Plaintiff Greco received notice that the forum was scheduled and contacted Defendant O'Hara to ask if he could attend. (Doc. 160, ¶¶ 49–50.)  Greco and O'Hara arranged a meeting in O'Hara's office at King's College, during which O'Hara said that The Mines was not a good mix with King's College and said that The Mines had the wrong crowd.  (*Id.* ¶¶ 50–51, 56.) O'Hara also told Greco that he had received letters from parents of King's College students saying that they would have to pull their children out of the college if the situation involving The Mines was not remedied or The Mines was not closed.  (*Id.* ¶ 59.)  O'Hara told Greco that Greco could not attend the forum.  (*Id.* ¶ 62.)

The King's College student forum proceeded as scheduled.  (Doc. 139, ¶ 63.)  The college's announcement of the forum contained a bullet point indicating that the college was working with the Pennsylvania Liquor Control Board

"regarding problems with The Mines." (Doc. 160, ¶ 1142.) Defendant Dessoye attended the forum, but Defendant Leighton did not. (Doc. 139, ¶¶ 63–64.) After the forum occurred, Defendant O'Hara summarized what was discussed in an email to his colleagues on the King's College faculty on April 15, 2009. (*Id.* ¶ 66.) This email did not specifically mention The Mines. (*Id.* ¶ 67.)

During this same period, Defendant O'Hara met with Defendants Leighton and Dessoye to discuss the growing violence in the area around King's College. (*Id.* ¶ 47.) O'Hara told Leighton and Dessoye that he thought police needed to be more proactive in the area. (*Id.* ¶ 48.) The Defendants did not specifically discuss The Mines during this meeting. (*Id.* ¶ 50.) Leighton told O'Hara that the City was working to address the situation. (*Id.* ¶ 52.)

Defendant McGonigle had also expressed concerns about the violence around King's College and the Wilkes-Barre Police Department's response in a meeting with O'Hara. (Doc. 160, ¶ 1112.) McGonigle thought that the police were not responding fast enough to incidents around King's College and thought that police should be stationed near The Mines on Thursday, Friday, and Saturday nights so that they could respond promptly. (*Id.* ¶¶ 1123–24.) McGonigle advised another King's College employee to tell admitted students that the college was working with the City on the problems with The Mines. (*Id.* ¶ 1127.) McGonigle also speculated in a series of emails in preparation for the student forum that

students would ask why the college had not been able to close down The Mines and why the college did not have police officers stationed outside The Mines.  (*Id.* ¶¶ 1130–33.)

In a separate meeting, Defendant Leighton met with Defendant Murphy to discuss the increased crime in the area surrounding King's College.  (*Id.* ¶ 946.)  As a result of this meeting, Defendant Leighton decided that there should be increased police patrol in the area.  (*Id.* ¶ 947.)  Leighton subsequently met with Murphy, Dessoye, and a member of Dessoye's staff about Leighton's concerns.  (*Id.* ¶ 953.)  Leighton's positions during these and other meetings about crime in the area was that there was a general localized increase in crime that could not be attributed to any specific source.  (*Id.* ¶ 959.)  The Mines was never specifically mentioned during these meetings by Leighton or anyone else.  (*Id.* ¶ 960.)

On April 20, 2009, Defendant O'Hara called Plaintiff Greco on the phone and stated that he was very upset by the recent violent incidents at The Mines.  (*Id.* ¶ 63.)  O'Hara reiterated that he was receiving complaints from King's College parents and alumni about The Mines and said that The Mines could not continue to operate.  (*Id.* ¶ 64.)  O'Hara stated that either King's College or King's College parents would petition to have The Mines closed.  (*Id.* ¶ 65.)  O'Hara allegedly told Greco during this meeting "we're going to close you down."  (*Id.* ¶ 176.)

Around this same time, Defendant Dessoye informed Defendant Leighton that King's College was concerned about crime in the area. (*Id.* ¶ 962.) Defendant O'Hara expressed this concern to Leighton in a phone call between the two individuals. (*Id.* ¶ 963.) Leighton advised O'Hara that the City and the police department were working to address the situation. (*Id.* ¶ 964.)

In late April 2009, the Wilkes-Barre Police Department significantly increased its presence in and around The Mines. (*Id.* ¶ 71.) This included police presence in The Mines' parking lot, police presence in and around the entries to The Mines, and regular presence of police cruisers and canine units. (*Id.* ¶¶ 71–72.) The police also placed bags on the parking meters outside The Mines. (*Id.* ¶ 73; Doc. 137, ¶ 187.) This was done at the direction of Captain Donald Crane ("Crane"). (Doc. 160, ¶ 864.) Comparable bars in the area were not subjected to equivalent police presence. (*Id.* ¶ 78.) One Black customer of The Mines, Arnell Cozart, was told by Wilkes-Barre police to not come back to The Mines. (*Id.* ¶ 199.)

On April 30, 2009, the Wilkes-Barre Police Department carried out a saturation patrol in the area outside The Mines. (Doc. 137, ¶ 197.) A saturation patrol is an increase in police presence in a certain area or neighborhood to address criminal activity, trends, or excessive complaints. (*Id.* ¶ 195.) Prior to the saturation patrol, Defendant Dessoye told Crane that increased law enforcement

presence was needed due to the March 27, 2009 incident in which Wilkes-Barre police officers had been surrounded by a crowd of people outside The Mines. (*Id.* ¶ 202.) The saturation patrol was also motivated by the other recent criminal incidents in the area. (*Id.* ¶ 203.) Dessoye and Crane coordinated the saturation patrol, and Leighton was not involved in the coordination. (*Id.* ¶¶ 205–08.) Nevertheless, as Wilkes-Barre's mayor, Leighton had authority over the Wilkes-Barre Police Department and accordingly had the authority to order the department to not conduct a saturation patrol. (Doc. 160, ¶¶ 943–44.)

Because the March 27, 2009 incident in which officers were surrounded originated at The Mines, Defendant Dessoye made the area outside of The Mines a particular focus of the saturation patrol. (Doc. 137, ¶¶ 212, 219.) Although The Mines was a focal point, the saturation patrol covered a two-block area of North Main Street and did not exclusively focus on the area outside of The Mines. (*Id.* ¶ 213.) As a result, a police officer was stationed near every bar on the street, including The Mines, Senuna's, Beer Boys, and Gonda's, and the areas outside of all the bars were subjected to the saturation patrol. (*Id.* ¶¶ 216–26.) Although police officers were stationed in and around The Mines during the saturation patrol, *id.* ¶ 226, the police officers did not physically stop or otherwise prevent customers from entering The Mines. (*Id.* ¶ 230.) Several officers involved in the

saturation patrol purportedly stated that the reason for the patrol was to deal with The Mines and the kind of people that frequented The Mines. (Doc. 160, ¶ 353.)

Prior to the April 30, 2009 saturation patrol, the Wilkes-Barre Police Department had conducted saturation patrols at several other bars in Wilkes-Barre, including The Hardware Bar, Chew's, Desi's, Liam's, Airey Tavern, and the Poplar Inn. (Doc. 137, ¶¶ 239, 243.)

Shortly after the saturation patrol, in May 2009, the Wilkes-Barre Police Department conducted a seatbelt check on North Main Street near the location of The Mines. (*Id.* ¶ 180.) This seatbelt check was performed at the direction of either Dessoye or Crane, but Dessoye specifically gave permission for it to occur. (Doc. 160, ¶¶ 881, 906.)

Plaintiff Greco spoke with Defendant Murphy in May 2009. (*Id.* ¶ 40.) Murphy told Greco that he had had a conversation with Defendants Dessoye and O'Hara about problems involving The Mines and told Greco that he should speak with Dessoye. (*Id.*) Greco subsequently contacted Dessoye and Dessoye told him that The Mines did not have a good mix and that it had the wrong crowd. (*Id.* ¶ 41.)

The Mines' business slowed down in the time after the April 30, 2009 saturation patrol. (*Id.* ¶ 212.) Some of the people employed at The Mines attributed the slowed business to the increased police presence around the bar.

(*See id.* ¶¶ 316, 417, 436, 463, 486–87.)  The business eventually closed in June or July of 2009.  (Doc. 137, ¶ 24.)  The Mines had originally opened in September 2008 and was open for less than one year before it closed.  (*Id.* ¶¶ 23–24.)

**DISCUSSION**

### A. Qualified Immunity

The court will first address whether Defendants are entitled to qualified immunity as to the remaining federal claims.  The doctrine of qualified immunity recognizes that despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The qualified immunity doctrine "protects all but the plainly incompetent or those who knowingly violate the law."  *Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580 U.S. __, 137 S. Ct. 548, 551 (2017)).  Thus, a government official may be entitled to qualified immunity even when his actions are "constitutionally deficient" if the officer "reasonably misapprehends the law governing the circumstances" of his actions.  *Taylor v. Riojas*, 592 U.S. __, 141 S. Ct. 52, 53 (2020).  In other words, a government

official is entitled to qualified immunity if the official shows "that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with recognized legal standards." *E.D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019).

Defendants asserting that they are entitled to qualified immunity have the burden to prove that the doctrine applies. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014). Courts follow a two-pronged test to determine whether qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). First, the court must determine whether the defendants violated the plaintiff's statutory or constitutional right. *District of Columbia v. Wesby*, 583 U.S. __, 138 S. Ct. 577, 589 (2018) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Second, the court must determine whether the right at issue was clearly established at the time of the violation. *Id.* (citing *Reichle*, 566 U.S. at 664). The court may exercise its discretion in deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### 1. City Defendants

Applying the above qualified immunity principles to the individual defendants' arguments, the court turns its attention to whether the individual City

Defendants are entitled to qualified immunity.[7]  The court will first consider

whether the right at issue—which the court defines as the right of a business to be

free from selective enforcement of local laws based on the race or ethnicity of its

clientele—was clearly established at the time of the alleged violation.  *See*

*Pearson*, 555 U.S. at 236 (noting that courts have the discretion to decide which

prong of the qualified immunity analysis should be decided first).

A right is clearly established if "every reasonable official would have

understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7,

11 (2015) (quoting *Reichle*, 566 U.S. at 665).  To be clearly established, there does

not have to be a case that is directly on point, "but existing precedent must have

placed the statutory or constitutional question beyond debate."  *Id.* (quoting

*Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)).  In determining whether a right is

clearly established, courts must not define the right "at a high level of generality."

*Id.* (quoting *Al-Kidd*, 563 U.S. at 742.)  Rather, the analysis should focus on

"whether the violative nature of *particular* conduct is clearly established."  *Id.*

(quoting *Al-Kidd*, 563 U.S. at 742).

---

[7] Only the individual City Defendants assert qualified immunity because a city is not entitled to
qualified immunity.  *Grant v. City of Pittsburgh*, 98 F.3d 116, 126 n.7 (3d Cir. 1996) (citing
*Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980)).

To determine whether a right is clearly established, the court may look to cases from the Supreme Court, controlling circuit precedent, or "a robust consensus of cases of persuasive authority" from other circuit courts. *Porter v. Pa. Dep't of Corrs.*, 974 F.3d 431, 449 (3d Cir. 2020) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)). Unpublished cases cannot establish a right because they do not constitute binding authority. *El v. City of Pittsburgh*, 975 F.3d 327, 340 (3d Cir. 2020). In rare cases, the unlawfulness of a government official's conduct may be established from the obviously unlawful nature of the defendant's conduct "even though existing precedent does not address similar circumstances." *Wesby*, 138 S. Ct. at 590 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

In this case, the City Defendants argue that the right at issue was not clearly established at the time of the alleged violation of Plaintiffs' rights. (Doc. 136, p. 64.) Plaintiffs argue that the right was clearly established, but the only case Plaintiffs cite that is factually on point[8] is *Desi's Pizza, Inc. v. City of Wilkes-*

---

[8] The other cases cited by Plaintiffs stand only for the general proposition that discrimination on the basis of race is unconstitutional. *See Gibson v. Superintendent of N.J. Dep't of Law & Public Safety – Div. of State Police*, 411 F.3d 427, 430–31 (3d Cir. 2005) (racially motivated traffic stop); *In re Montgomery County*, 215 F.3d 367, 377 (3d Cir. 2000) (retaliatory firing based on employee's complaints of race discrimination); *Liotta v. Nat'l Forge Co.*, 629 F.2d 903 (3d Cir. 1980) (same); *Mahone v. Waddle*, 654 F.2d 1018, 1028 (3d Cir. 1977) (racially motivated arrest and prosecution); *Branch v. Odhner*, No. 3:15-CV-01971, 2018 WL 1129596, at *8 (M.D. Pa. Mar. 1, 2018) (selective enforcement of an ordinance governing solicitation without a license based on the race of the person soliciting); *Grier ex rel. Grier v. Galinac*, 740 F. Supp. 338

*Barre*, No. 01-CV-00480, 2006 WL 2460881 (M.D. Pa. Aug. 23, 2006), an unpublished case from this district in which the owners of a pizza shop in Wilkes-Barre alleged that Wilkes-Barre and various Wilkes-Barre employees had violated its constitutional rights by selectively enforcing local laws against the pizza shop based on the race of the pizza shop's customers. *Id.* at *1.  In that case, the court found that it was clearly established that "unequal enforcement of the laws against an establishment based on the race of its clientele . . . violate[s] the Fourteenth Amendment." *Id.* at *37.  *Desi's Pizza*, however, cannot establish a right because it is an unpublished case. *See El*, 975 F.3d at 340 (noting that unpublished cases cannot establish a right).

This is also not a case where the violation of Plaintiffs' rights is so obvious that the right may be deemed clearly established despite the lack of on-point precedent. *See Wesby*, 138 S. Ct. at 590.  Notably, a well-respected judge in this district previously concluded that Defendants were entitled to summary judgment as to Plaintiffs' civil rights claims based on a lack of evidence that Defendants had committed the alleged violations.  Although that conclusion was overturned on

---

(M.D. Pa. 1990) (racially motivated arrest).  Accordingly, because a court considering whether a defendant is entitled to qualified immunity must not define the right at issue at a high level of generality, *Mullenix*, 577 U.S. at 11, the court will disregard these cases in determining whether the right at issue in the present case was clearly established.

appeal to the Third Circuit, it nonetheless supports the notion that this is not the rare case where a right may be deemed established without the aid of precedent.

The court therefore finds that the right at issue in this case was not clearly established at the time of the alleged violation and accordingly concludes that the individual City Defendants are entitled to qualified immunity.

### 2. College Defendants

Having concluded that the individual City Defendants are entitled to qualified immunity, the court turns its attention to whether individual College Defendants O'Hara and McGonigle are entitled to qualified immunity. Before doing so, however, the court must consider a threshold argument raised by Plaintiffs that the College Defendants are not permitted to assert qualified immunity at this stage of litigation. (Doc. 225, p. 23.)

Plaintiffs argue that the College Defendants cannot assert qualified immunity for two reasons. First, because the Third Circuit directed the court to consider only whether the City Defendants are entitled to qualified immunity, *see Rittenhouse*, 782 F. App'x at 156 n.5, and second, because the College Defendants did not assert qualified immunity in their original summary judgment briefing. (Doc. 225, p. 23.)

Plaintiffs are incorrect. When a summary judgment ruling is vacated and remanded from a circuit court, the district court on remand is free to consider any

new motions or issues that it deems appropriate. *Krieger v. Ownership Corp.*, 270 F.2d 265, 273 (3d Cir. 1959) (per curiam) (on petition for rehearing en banc); *see also Quinn v. Stone*, 978 F.2d 126, 137 (3d Cir. 1992) (citing *Krieger* for the proposition that a district court on remand is free to consider additional summary judgment motions); TRACY BATEMAN ET AL., FEDERAL PROCEDURE, LAWYER'S EDITION § 62:694 *Effect of Remand of Summary Judgment*, Westlaw (database updated March 2021) ("[U]pon remand, the district court is free to consider any motion which may be presented to it, including the renewal of the motion for summary judgment, and to permit such amendments to the pleadings or the filing of such affidavits by either party to the action as it may deem permissible.").

Furthermore, the court does not construe the Third Circuit's opinion as directing the court to only consider whether the City Defendants are entitled to qualified immunity to the exclusion of the College Defendants. The Third Circuit instructed the court to consider whether the City Defendants are entitled to qualified immunity because at that point in the case the qualified immunity defense had only been asserted by the City Defendants. Nothing in the court's opinion indicated that the court meant to exclude the College Defendants from also asserting qualified immunity.

Accordingly, this court on remand had the discretion to order briefing on the question of whether all remaining defendants are entitled to qualified immunity,

26

and that is exactly what the court did.  (*See* Doc. 215.)  Plaintiffs are therefore incorrect that the College Defendants are precluded from asserting qualified immunity at this stage of litigation.

Turning to the merits of the College Defendants' qualified immunity argument, the College Defendants argue that O'Hara and McGonigle are entitled to qualified immunity under the principles set forth in *Filarsky v. Delia*, 566 U.S. 377 (2012).  (Doc. 221 at 8–10.)  In *Filarsky*, the Supreme Court held that an attorney who had been temporarily retained by a municipality for the purpose of conducting an internal affairs investigation into the conduct of one of the municipality's firefighters was entitled to qualified immunity notwithstanding the fact that the attorney was not a full-time employee of the municipality.  566 U.S. at 393–94.

O'Hara and McGonigle assert that they are entitled to qualified immunity under *Filarsky* because Plaintiffs allege that they were working in concert with government actors to violate Plaintiffs' rights.  (Doc. 221, pp. 8–10.)  Although O'Hara and McGonigle deny that were working in concert with government actors, they argue that "Plaintiffs cannot have it both ways":

> Either Father O'Hara and Mr. McGonigle worked in concert with the City and therefore they are "state actors," which in turn provides them with immunity, or they did not act in concert, which causes Plaintiffs federally based claims to fail against them, since they are not state actors and liability for Constitutional violations does not attach.

(*Id.* at 10.)

Plaintiffs respond that they can, in fact, "have it both ways" because the question of whether a defendant is acting in concert with government actors and the question of whether the same defendant is entitled to qualified immunity are subject to different standards. (Doc. 225, p. 25.) Plaintiffs note that O'Hara and McGonigle do not provide any argument as to why they are entitled to qualified immunity beyond the fact that they were allegedly acting in concert with government actors and argue that they therefore fail to establish qualified immunity. (*Id.* at 25–26.)

Plaintiffs are correct that the question of whether a defendant has acted in concert with a government actor is a distinct question from whether the defendant is entitled to qualified immunity and that O'Hara and McGonigle have not raised any arguments as to why they are entitled to qualified immunity. Although O'Hara and McGonigle assert that this case is analogous to *Filarsky*, they do not take the extra and necessary step of arguing why they are entitled to qualified immunity if *Filarsky* does apply. Nevertheless, the court still concludes that O'Hara and McGonigle are entitled to qualified immunity because, as detailed above, the right at issue in this case was not clearly established at the time of the facts of this case. Accordingly, assuming without deciding that *Filarsky* applies to the present case, the individual College Defendants are granted summary judgment as to Counts I, II, and III on the basis of qualified immunity.

## B. Intentional Interference

The court will next consider whether Defendants are entitled to summary judgment as to Plaintiffs' tortious interference with a contract claim. When this claim was previously considered by the court, Judge Caputo declined to exercise supplemental jurisdiction over it in light of his conclusion that Defendants were entitled to summary judgment as to all remaining federal claims. (*See* Doc. 201, p. 31.) The Third Circuit reversed the grant of summary judgment as to some of the federal claims and accordingly directed this court to consider whether Defendants are entitled to summary judgment as to the tortious interference claim. *See Rittenhouse*, 782 F. App'x at 156, n.6.

To establish tortious interference with a contract under Pennsylvania law, a plaintiff must prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Duran v. Cty. of Clinton*, 380 F. Supp. 3d 440, 455 (M.D. Pa. 2019) (quoting *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009)).

At the outset, the court will grant summary judgment to the extent that Plaintiffs' tortious interference claim is based on Defendants' alleged interference with the Plaintiffs' efforts to secure benefits and development funding under the KOZ program because the City Defendants argue that there is no evidence to support such a claim and Plaintiffs do not oppose this argument. *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014) ("[A] non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended."). Accordingly, the court will analyze the tortious interference claim only to the extent that it is based on Defendants' allegedly tortious interference with The Mines' business.

Turning then to the Defendants' alleged interference with The Mines' business, Defendants make several arguments as to why they should be granted summary judgment as to Plaintiffs' tortious interference claim. First, both groups of Defendants argue that Plaintiffs' tortious interference claim fails because Defendants' actions were privileged or justified. (Doc. 221, pp. 3–6; Doc. 222, p. 10.) Specifically, the College Defendants argue that their actions were privileged because the only actions that College Defendants allegedly took was to report true information to King's College students and the police. (Doc. 221, pp. 3–6.) The City Defendants argue that the actions by the police were justified because the

police "had a law enforcement justification for being present due to the well-recorded criminal issues in the neighborhood of The Mines." (Doc. 222, p. 10.)

The question of whether a defendant's actions are privileged or justified hinges on whether the actions were "improper." *Meyer v. Del. Valley Lift Truck, Inc.*, 392 F. Supp. 3d 483, 496 (E.D. Pa. 2019) (quoting *Salsgiver Commc'ns, Inc. v. Consol Commc'ns Holdings, Inc.*, 150 A.3d 957, 966 (Pa. Super. 2016)). "Although what is proper conduct in a given situation is not capable of being precisely defined, the central inquiry is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'" *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 503 (E.D. Pa. 2018) (quoting *Adler, Barish, Daniels, Levin, & Creskoff v. Epstein*, 393 A.2d 1175, 1184 (Pa. 1978)).

Whether a defendant's actions are privileged or justified "is ordinarily a fact intensive inquiry that necessitates jury consideration." *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*, 321 F. Supp. 3d 503, 522 (M.D. Pa. 2018). The court sees no reason to depart from this general principle in this case. There is sufficient evidence for a reasonable finder of fact to conclude that the police selectively enforced local law against The Mines and that this selective enforcement was caused by the efforts of the College Defendants. The question of whether the Defendants' actions were privileged or justified should therefore go to a jury.

31

The College Defendants next argue that Plaintiffs have failed to identify a third party or prospective third party who was a party to a contract with which the Defendants interfered. (Doc. 221, pp. 6–8.) This is very similar to an argument made in *Cole v. Encapera*, No. 2:15-CV-00104, 2017 WL 3503121 (W.D. Pa. Aug. 16, 2017), *reversed in nonrelevant part*, 758 F. App'x 252 (3d Cir. 2018), a recent case in which the Western District of Pennsylvania analyzed a tortious interference claim involving facts that were very similar to the facts of this case.

In *Cole*, local police allegedly parked their cars outside of a plaintiff's bar and regularly accosted individuals as they entered and exited the bar, which allegedly caused customers to stop going to the bar. *Id.* at *4. The plaintiff brought a claim for tortious interference with a contract, and one of the defendant police officers moved for summary judgment, arguing that the tortious interference claim failed because the plaintiff could not specifically name any customers who had stopped going to the bar as a result of the police presence. *Id.* at *20. The court rejected this argument, finding it immaterial that the plaintiff could not name any specific customers who had stopped going to the bar, since there was evidence in the record from which it could be inferred that the police presence had caused people to stop going to the bar. *Id.*

The court finds the reasoning of *Cole* persuasive. It is undisputed in this case that business at The Mines slowed considerably in the months following the

increased police presence and that the bar eventually closed in the summer of 2009, and a reasonable finder of fact could infer that this slowdown in business was because of the increased police presence. Plaintiffs have therefore presented sufficient evidence to establish the existence of a contract or a prospective contractual or economic relationship.

The City Defendants additionally argue that the police did not tortiously interfere with The Mines' business because the police who were stationed outside of The Mines did not physically stop or otherwise prevent customers from entering The Mines. (Doc. 222, p. 9.) The court is not persuaded. The City Defendants offer no support for the assertion that police must physically prevent customers from entering a nightclub in order to tortiously interfere with the nightclub's business, and the court finds that a reasonable finder of fact could infer tortious interference from the increased police presence around The Mines.

The court accordingly concludes that a reasonable finder of fact could find that the increased police presence in and around The Mines constituted tortious interference with a contract. Defendants Leighton and Dessoye could be held liable for this tortious interference because they exercised direct control over the Wilkes-Barre Police Department. Defendants O'Hara and McGonigle could also be held liable for this tortious interference because there is evidence in the record from which a reasonable finder of fact could conclude that they intentionally

caused the Wilkes-Barre Police Department's increased presence in the area outside of The Mines.

The other individual defendants—Murphy, Thomas, Kane, Barrett, Cronauer, Merritt, and Frati—cannot be held liable for tortious interference with a contract because there is no evidence in the record from which a reasonable finder of fact could conclude that they exercised direct control over the Wilkes-Barre Police Department or caused the increase police presence outside of The Mines.

Accordingly, the court will grant summary judgment on the tortious interference claim as to Defendants Murphy, Thomas, Kane, Barrett, Cronauer, Merritt, and Frati, but deny summary judgment as to Defendants Leighton, Dessoye, O'Hara, and McGonigle.

### C. Plaintiffs G Net and Phoenix Are Dismissed

Finally, the court notes that the only claims pertaining to Plaintiffs G Net and Phoenix are the claims arising from Plaintiffs' efforts to secure benefits and development funding under the KOZ program. Because all such claims have been dismissed, the court will dismiss Plaintiffs G Net and Phoenix from this case.

## CONCLUSION

For the foregoing reasons, the individual Defendants are granted summary judgment as to Counts I, II, and III on the basis of qualified immunity and Defendants Murphy, Thomas, Kane, Barrett, Cronauer, Merritt, and Frati are

granted summary judgment as to Count V.  The case shall accordingly proceed as to Counts I, II, and III against Defendants Wilkes-Barre and King's College and as to the tortious interference claim in Count V against Defendants Leighton, Dessoye, O'Hara, and McGonigle.  All other defendants shall be dismissed from the case.  Plaintiffs G Net and Phoenix will also be dismissed.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: May 7, 2021